150 So. 386

## STATE v. CHANDLER.
### No. 32407.

July 7, 1933.

Rehearing Denied Oct. 3, 1933.

Edward L. Gladney, Jr., of Bastrop, for appellant.

G. L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., Frank W. Hawthorne, Dist. Atty., of Bastrop, and James O'Niell, Sp. Asst. to Atty. Gen., for the State.

ODOM, Justice.

Defendant was prosecuted for murder, convicted of manslaughter, and sentenced to hard labor for a term of not less than three nor more than four and a half years. This appeal followed.

The errors of which he complains are set out in eight bills of exception.

Bill No. 1 was reserved to the refusal of the court to sustain defendant's challenge of a juror on the ground of his relationship to deceased. Article 351 of the Code of Criminal Procedure provides that one of the causes for which a juror may be challenged is: "That the relations, whether by blood, marriage, employment, friendship or enmity, between the juror and the accused, or between the juror and the person injured, are such that it must be reasonably believed that they would influence the juror in coming to a verdict."

The examination of the juror on his voir dire disclosed that his father-in-law was either a first or second cousin to the mother of deceased; he was not sure which. He said he had heard his father-in-law refer to deceased as "Cousin Jim Doles." He was asked if "the families visited back and forth," and he said, "No, Sir; the only time I have seen Mr. Doles at the place was when Mr. Reilly and I were up there on that coffee job." He stated in answer to questions propounded to him that he would disregard the fact of this family connection and "exclude" even the knowledge of it in his deliberations.

The relationship or rather the family connection shown to exist in this case is entirely too remote to be considered as a disqualification on the juror. Furthermore, the question of the competency of the jurors is one which is left largely to the sound discretion of the trial judge. State v. Caron, 118 La. 349, 42 So. 960; State v. Dunn, 161 La. 532, 109 So. 56; State v. Scarborough, 152 La. 669, 94 So. 204.

2. Bill No. 2 was reserved to the refusal of the trial judge to grant a continuance. The motion for continuance was based on the ground that two witnesses summoned by defendant were absent on account of illness. In his motion for continuance defendant set out what he expected to prove by said witnesses, and that their testimony was relevant and material. But he did not state that the facts to which the witnesses would testify could not be proved by any witness in attendance upon the court. That was necessary under article 322 of the Code of Criminal Procedure, which provides that:

"Every motion for a continuance based rpon the absence of witnesses must show:

"(1) By a disclosure of all the facts which the absent witnesses are expected to testify

to, the materiality of said testimony, and that said facts can be proved by no witness in attendance upon the court."

The motion for continuance was defective. Aside from that, however, the granting or refusal to grant a continuance is largely within the discretion of the trial court. Article 320 of the Code of Criminal Procedure provides that:

"The granting or refusing of any continuance is within the sound discretion of the trial judge; provided, that any arbitrary or unreasonable abuse of such discretion may be reviewed by the proper appellate tribunal on appeal."

This was the rule long before the adoption of the Code. State v. Chevallier, 36 La. Ann. 81, 86; State v. Taylor, 167 La. 1113, 120 So. 875; State v. Dundas, 168 La. 95, 121 So. 586; State v. Flores, 169 La. 22, 124 So. 132; State v. Chevallier, 169 La. 135, 124 So. 670.

The trial judge does not seem to have abused his discretion in this case.

3. Bill No. 3. The state offered to prove by a certain witness that a 16-gauge gun had been recently discharged as evidence that it was the weapon with which the fatal wound was inflicted. On cross-examination counsel for defendant asked the witness if he had not stated at the preliminary trial that a 12-gauge gun had been fired. This question was asked for the purpose of laying a foundation for impeaching the testimony of the witness. The question was objected to on the ground that a proper foundation had not been laid. The objection was sustained and bill No. 3 was reserved.

Under article 493 of the Code of Criminal Procedure, and under the rule which prevailed here prior to its adoption, in order to impeach the credibility of a witness by proof that he had on a former occasion made statements contrary to the testimony which he was then giving, it is necessary to first ask him if he made such statement, and his attention must first be called to the time, place, and circumstances, and to the person to whom the alleged statement was made, "in order that the witness may have an opportunity of explaining that which is prima facie contradictory."

Without going through this formality, the proper foundation for impeaching the witness is not laid. In this case the witness was asked if he did not make a certain statement while a witness at the preliminary trial of the accused. That question sufficiently directed the attention of the witness to the time, place, and circumstance of his making the statement, and the person or persons to whom made.

The trial judge did not write a per curiam to the bill, and we are not informed as to his reasons for refusing to permit the impeachment of the witness. But as there is nothing in the bill to show the materiality of the testimony sought by the state, we assume that the ruling of the judge was based on that ground.

"It is not competent to impeach a witness as to collateral facts or irrelevant matter." Code Criminal Procedure, art. 494.

The relevancy of the question whether a 12 or 16 gauge gun had been recently discharged does not appear from the bill. There is nothing to show what kind of a gun defendant owned or whether he owned any kind of a shotgun, either a 12 or a 16 gauge; or that

accused used any shotgun on the occasion of the homicide, or whether deceased was killed with a shotgun.

The facts recited in the bill are entirely too meager for us to decide whether the testimony was relevant or whether the facts sought to be brought out were merely collateral. We cannot therefore say that the trial judge erred in his ruling.

■ Bill No. 4. From this bill and those which follow, it appears that one contention made by defendant was that the fatal wound was inflicted accidentally by the deceased himself. Apparently anticipating this defense, the state called a physician and asked him if in his opinion the deceased could have inflicted the wound upon himself without being powder burned. This question was objected to by counsel for defendant on the ground that the physician had not been qualified as an expert in the use of firearms, and for that reason should not be allowed to express an opinion. The bill recites that the objection was first sustained, "Whereupon the District Attorney then asked the witness the same question, which question was objected to for the same reason as stated in the objection to the previous question. Whereupon the court overruled the objection and counsel then and there reserved a bill."

It thus appears that the court first sustained defendant's objection on the ground that the witness had not shown that he was an expert in the use of firearms, and that it later permitted him to testify. While the recitals of the bill do not show it, we must assume that after the first objection was made, the witness then qualified, after which he was permitted to express an opinion.

■ Bills Nos. 5, 6, and 7 all relate to the same subject-matter, and are considered together. Defendant offered to prove that after the fatal wound was received by deceased he made the statement that he had shot himself. The state objected to the testimony on the ground that the statement was neither a dying declaration nor part of the res gestæ. This objection was sustained and bills were reserved.

The statement was inadmissible as a dying declaration for the reason that there is nothing to indicate that it was made while the wounded man was conscious of an "impending dissolution." About the time he made the statement that he had shot himself, he was asked by his wife how he felt, and he replied, "I feel pretty tough." This does not indicate that he had abandoned all hope and expectation of living.

■ If the statement was admissible at all, it was so only upon the hypothesis that it was part of the res gestæ. The statement was exculpatory in its nature, and the rule is that: "Declarations of the person injured which tend to exculpate the accused, such as declarations that the act was an accident, or that the person injured or a third person was at fault, or declarations expressing forgiveness or reluctance to prosecute, are not admissible, where they are not part of the res gestæ, or dying declarations."

The reason is "That the person injured by the crime, whether alive or dead, is in no sense a party to the prosecution, and therefore his statements and declarations are not evidence either for or against the accused, unless they are relevant on the question of defendant's guilt and were made in his pres-

ence, or unless they are admissible as part of the res gestæ, as dying declarations or as threats. Such testimony is generally inadmissible as hearsay." 16 Corpus Juris 639-641, §§ 1269-1274.

In support of the above texts, cases from twenty-five states are cited.

Practically the same text is found in 12 Cyc. 429-431.

■ The question then is whether the statement made by the wounded man, who subsequently died, was part of the res gestæ.

"Res gestæ are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events." Code of Criminal Procedure, art. 447.

"To constitute res gestæ the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction." Code of Criminal Procedure, art. 448.

The alleged statement was made by the wounded man approximately 15 minutes after the shooting at a place in the road some 200 yards from the scene. He was then lying down with his head in another man's lap. Luther Brown testified that while he was present he heard the wounded man say, "I shot Charley Chandler (a brother of the accused) twice through the stomach and shot myself."

Jesse Pardue, another witness, said he heard him say, "I shot myself."

Mrs. Myrtle Pardue was asked if she heard him say anything, and she replied, "It has been so long ago, I have forgotten." When the question was repeated, she answered, "He said, 'I shot myself', something like that."

Whether this was an isolated statement or exclamation, or whether it was made while narrating the event, is not made certain. Luther Brown's version of what he said indicates that he was narrating the events. He probably was. At any rate there is nothing in the recitals of the bill or the testimony to indicate that what he said was "under the immediate pressure of the occurrence," or that they were "impulsive and spontaneous words." It is certain that what he said as relates to the act of shooting did not "form in conjunction with it one continuous transaction."

It is impossible to determine just how long after the shooting it was before the statement was made. The only witness who estimated the time said, "It must have been fifteen minutes, I guess."

The shooting took place in a rural section of the parish. Mrs. Pardue, who heard the statement, did not pretend to estimate the time. But she said that Luther Brown was present when she reached the place where the statement was made. Jesse Pardue, the other witness, was not asked to state the time.

It seems that Dr. Miller was present attending the patient when the statement was made. He was not called as a witness. Just where he lives, how far from the scene, or how long it took to get him is not disclosed.

Under the facts and circumstances disclosed by the record, we do not think the statement was part of the res gestæ and must therefore hold that it was properly excluded.

Bill No. 8 was reserved to the refusal of the trial judge to permit counsel for defendant to offer in evidence a subpœna issued for a witness by the state; the witness being present but not called.

Counsel practically concedes that there is no merit in this bill, and it is not pressed.

For the reasons assigned, the verdict and sentence are affirmed.

O'NIELL, C. J., dissents from the rulings on bills 2 and 3, and 5 to 7, inclusive.