No. 31,366

THE STATE OF KANSAS, *Appellee,* v. HUGH HOOPER, *Appellant.*

(37 P. 2d 52)

Opinion filed November 3, 1934.

*John W. Davis,* of Dodge City, *Thomas F. Doran, Clayton E. Kline, Harry W. Colmery, M. F. Cosgrove, Balfour S. Jeffrey* and *Howard H. Becker,* all of Topeka, for the appellant.

*Roland Boynton,* attorney-general, *E. E. Steerman,* assistant attorney-general, and *James D. Dye,* county attorney, for the appellee; *H. W. Stubbs,* of Ulysses, of counsel.

The opinion of the court was delivered by

HARVEY, J.: The appellant, Hugh Hooper, was charged with the murder of Frank Lahey on August 24, 1931. At the trial the fact that defendant shot and killed Lahey was not controverted. The defense interposed was justifiable homicide—self-defense. Defendant was found guilty of manslaughter in the first degree. He has

appealed, and contends that the court erred: (1) In overruling his motion for a change of venue; (2) in overruling his challenge to the array of jurors; (3) in overruling his challenges to certain jurors for cause; (4) in rulings on the admission and exclusion of evidence; (5) in refusing his request for copy of transcript of testimony taken before the coroner's jury; (6) in refusing to give instructions requested; (7) in instructions given; and (8) in overruling his motion for a new trial.

The record discloses facts which may be stated as follows: About 1918 appellant moved into the southeastern part of Grant county with his family, consisting of his wife and one daughter. He purchased 560 acres of farm and pasture land and began running a small herd of cattle. By the time of the homicide in question he had increased his land holdings to 800 acres, and in addition to that leased land which he operated. In the summer of 1931 he and one C. E. Workman together operated a pasture of 1,480 acres, the land in which they owned or leased. It consisted of the east half of section 22, all of section 23, the north half and the northwest quarter of the southwest quarter of section 26, and the east half of the east half of section 27, all in township 30 S., range 35 W., and which was inclosed as one pasture. The Cimarron river enters this pasture near the southwest corner and flows northward into the southeast corner of section 22, thence northeast, east and southeastward, leaving the pasture near the southeast corner of section 23. The north fork of the Cimarron river enters the pasture from the west, a little south of the center of section 22, and flows southeastward into the Cimarron river in the southwest quarter of section 23. Hooper had built a small house, frequently spoken of in the evidence as the "white house," on the southwest quarter of the southeast quarter of section 22, about 125 yards from the west line and about 300 yards from the south line of that forty-acre tract. East of the white house a short distance was a windmill, and to the northeast of the white house, about 75 yards, was a water tank. No one was living at these premises at the time of the homicide. Workman lived on the northwest quarter of section 24, directly east of the northeast quarter of this pasture. Hooper lived on the southwest quarter of section 27, about three-fourths of a mile west of the southwest corner of the pasture and a little more than one mile south and about a half mile west of the white house above mentioned. Directly south of the forty acres on which the white house was situated was an eighty-

acre tract in cultivation, one-half mile long north and south and one-fourth of a mile wide, fenced on all its sides with a four-wire fence; and directly west of the forty acres on which the white house was situated was a field, also in cultivation. Hooper farmed both of these tracts and was having them drilled to rye at the time of the homicide.

Directly south and to the southwest of the land owned and operated by Hooper the several members of the Lahey family owned and operated a considerable acreage of farm and pasture land. The elder member of this family, usually spoken of in the evidence as "Uncle Jimmie" Lahey, settled in that vicinity about forty years ago. He had a family of at least two sons, Jimmie Lahey and Frank Lahey, and two daughters, Mrs. W. R. (Ted) Rowland and Mrs. J. H. Gray; all of whom were married and had homes within a few miles of each other. "Uncle Jimmie" Lahey lived about one mile south of Hooper. Frank Lahey lived a mile west and a half mile south of Hooper, and Ted Rowland lived a mile east and a mile south of Hooper. From where the Cimarron river enters the Hooper-Workman pasture, following it upstream, its course is to the southwest, west, then to the northwest; so that Hooper lived north of the Cimarron river and the Laheys and Rowland south of it. Perhaps Frank Lahey was born at his father's place, above mentioned; at any rate he had lived in that vicinity practically all his life. His pasture land joined the Hooper-Workman pasture, above described, directly on the south.

For as long as five or six years prior to the homicide Hooper and Frank Lahey had trouble. It began over the fences between the pastures. Hooper testified—and it is the only evidence on the subject—that on a number of occasions Lahey let the fence down, or left the gates open, and permitted his cattle to come into Hooper's pasture. He went to see Lahey about that. Hot words were exchanged. Hooper struck Lahey with a tug, which was a chain, or part chain. For this Lahey had Hooper arrested, and Hooper paid a fine and was also put under a peace bond. Later Hooper complained to the officers that Lahey was operating a still and caused his arrest. A trial of that case resulted in Lahey's acquittal. Soon after that Lahey, who was on horseback, stopped Hooper, who was in an automobile without a top, on the road. There were hot words. Lahey cursed Hooper and, among other things, said: "You turn me in and I'll get even with you," and struck Hooper with a quirt

and rode away. At another time the parties met at the stockyards at Satanta, where they were delivering hogs. They fought, and onlookers separated them. There is a conflict in the evidence as to which one started the fighting on that occasion. In May, 1931, they had trouble about a certain forty-acre tract of pasture. It seems Hooper owned or had leased land which included this forty-acre tract inside of Lahey's pasture, and apparently there had been some understanding that Lahey might use it if he paid rent, which he had not done for two years. Hooper changed the fences so as to include it in his pasture. Lahey and his brother-in-law, Ted Rowland, went to Workman, who was interested with Hooper in his pasture. Workman and Rowland had about agreed on a plan by which the forty acres would continue to be used by Lahey. Workman called Hooper, who was not far away, and told him of the agreement they were about to make. Hooper objected to it. Lahey then got into the conversation and he and Hooper used harsh words toward each other. Rowland told Lahey to get on his horse and ride away. Lahey got on his horse; he was angry, and attempted to spur his horse onto Hooper and perhaps the other men there. Among other things he said to Hooper: "I'll mash your head in." Rowland got on his horse and he and Lahey rode away. It appears that until about 1925 Hooper and Frank Lahey had exchanged the use of farm implements, but in that year, on one occasion, Hooper went to Lahey's place to get implements Lahey had borrowed and at that time he told Lahey he was through with him and wanted him to stay off his place. There is evidence that for several years prior to the homicide Lahey had carried a pistol, or revolver of some kind, at least part of the time. He talked with several persons about his difficulties with Hooper. To some he said he would get even with Hooper. To one he said: "If I meet that old boy (Hooper) out there, there will be some lead flying." On another occasion he said: "I am carrying this gun for Hugh Hooper, and sometime I am going to use it." To another he is said to have remarked: "Me and Hugh Hooper have had trouble and that is the reason I am carrying the gun, and if things ever turn out right I am going to kill the dirty, yellow son-of-a-bitch." To another he said that Hooper had turned him in for running a still, and said: "I am going to kill him if he ever crosses my path." Lahey had some fence to build near the Hooper land. He went to one Ragan to get him to build it, and explained that Ragan was on friendly terms

with Hooper and could build it without trouble, while if he tried to build it he might have trouble with Hooper. These talks and threats of Lahey came to be known by Hooper from time to time. Throughout this time Hooper was also talking about Lahey, and on at least two or three occasions Hooper had said he would kill Lahey if he came upon Hooper's land. Lahey had been informed of these statements of Hooper.

In the summer of 1931 Hooper and Workman together looked after the 1,480-acre pasture, previously described, and the cattle therein, and one or both of them rode the fences every day. On the Saturday before the homicide, which occurred on Monday, Workman, while riding through the pasture, noticed one of Hooper's steers was sick. On the morning of the homicide Workman went into the pasture to ride the fences and to look for the sick steer. He entered the pasture near the southeast corner of section 23 and rode north, not far from the east fence, to within about a quarter of a mile of the northeast corner of the pasture. There he was met by Hooper, who had ridden across the pasture from the southwest. It was then about 10 o'clock. They talked a few minutes and both started to look for the sick steer. They rode in a southwesterly direction toward the place where the north fork of the Cimarron empties into the Cimarron river. There the land was rolling and the grass and weeds high in the low places. When they neared this point they saw two men on horseback south or southeast from them, perhaps 200 yards away, who were riding in an easterly or northeasterly direction. They testified they did not recognize the men or the horses. The men proved to be Frank Lahey and Archie Wyatt. Lahey was wearing overalls and a Stetson hat, such as cowmen frequently wear. Wyatt was dressed in white—white shirt, white pants, oxford shoes and a straw hat. He was riding a larger horse than was Lahey and was on the north and northwest side of him. The two parties did not speak or greet each other. Early that spring one of Lahey's steers, a mottled-faced yearling, got out of his pasture into the Hooper-Workman pasture and had been turned back twice by Workman or Hooper. On Sunday, the day before the homicide, there had been a picnic and dinner at Uncle Jimmie Lahey's attended by his relatives and friends, including Frank Lahey, and which was also attended by Archie Wyatt. He was a young man who worked as a farm hand. His father lived in Colorado, which place he called his home, but he had worked as a

farm hand for various persons in southwestern Kansas and in Oklahoma and Texas. He had worked through harvest four years for J. H. Gray, the son-in-law of Uncle Jimmie and brother-in-law of Frank Lahey. He had been working for Gray, but had finished the day before this picnic. On the day of the picnic Frank Lahey told Wyatt that he wanted to go the next day to look for a steer that was out of his pasture and told Wyatt he would give him a dollar if he would go with him to help get the steer, and Wyatt agreed to go. Wyatt stayed Sunday night at Uncle Jimmie's, and the next morning, about 9:30 o'clock, started to walk to Frank Lahey's. On the way he met Frank Lahey riding a horse and leading another without a saddle. He got on that horse and they rode to Uncle Jimmie's, where they got a saddle and rode on to Ted Rowland's. Rowland had a horse he had been keeping, which he desired to have ridden. Frank Lahey had the horse for some time, about a year before, breaking him to ride, but Rowland thought the horse was not thoroughly broken and asked Frank Lahey to ride him that day. He did so, letting Wyatt take the horse he had been riding. Wyatt carried no fire arms, and did not know Frank Lahey was armed. From Rowland's place Frank Lahey and Wyatt had gone north through a gate or fence into the Hooper-Workman pasture and had ridden north and northeast toward the Cimarron river and through one or two small bunches of cattle grazing near the river, when they were seen and passed by Hooper and Workman, as above stated. Lahey told Wyatt the men were Mr. Hooper and Mr. Workman, and also said: "There is one of those fellows and me that don't get along well." Wyatt replied to Lahey: "We can just get our steer and get back out of here." They continued to ride in a northeasterly direction up to the northeastern part of the pasture, then west and southwest to a point about 150 yards east of the windmill near the white house on the southwest quarter of the southeast quarter of section 22, where there was a little hill, or knoll, covered with soapweed. They met Workman, who had reached that place just before they did. When Workman and Hooper saw Lahey and Wyatt in the pasture and passed about 200 yards from them without recognizing them, as they testified, Hooper, without saying where he was going, or why, or when he would be back, if at all, rode off to the southwest. Up to that time Workman had seen no gun on Hooper's saddle. Hooper had a man, Jack McKeegan, working for him, drilling rye in the eighty-acre field

south of the forty acres on which the white house was situated. This forty acres was separated from the rye field by an east-and-west fence a quarter of a mile long. At the northeast corner of the rye field the fence turned south for a mile. At the northwest corner of the rye field, being the southwest corner of the forty acres on which the white house is situated, there was a gate leading into the pasture, also a gate leading into the field west of the forty acres on which the white house was situated. Nearly half a mile south of this corner, in the fence on the west side of the rye field, first described, was a gate leading into the field from the west. Mc-Keegan had finished drilling this eighty-acre rye field south of the forty acres on which the white house was situated and had taken his team and drill into the field west of the forty acres on which the white house was situated and was there drilling rye. When Lahey and Wyatt met Workman at the little knoll about 150 yards east of the windmill on the forty acres on which the white house was situated Frank Lahey spoke pleasantly to Workman, they exchanged greetings, and Lahey asked Workman "if he had seen anything of that steer." Workman knew what steer was meant, and replied that he had not seen the steer since he had last seen Lahey, or words to that effect. Lahey had inquired of Workman about the steer sometime in June, and perhaps once later. Wyatt said something to Workman about his having nice cattle there in the pasture, and Workman replied: "Yes, and quite a bunch of them." After the parties talked a short time—not more than five minutes—Lahey remarked to Wyatt that "We had as well be going," or "We had better be going." It was then about 12:30 o'clock. Lahey and Wyatt started to ride off to the southeast toward the place where they had entered the pasture in the morning. This took them near the corner of the fence at the northeast corner of the eighty-acre rye field, which would be at the southeast corner of the forty acres on which the white house was situated.

The story of the homicide is best told by summarizing as follows the testimony of the three witnesses who were present: Wyatt testified: Immediately after we left Workman I saw Hooper come through the gate in the fence at the northwest corner of the eighty-acre rye field and get on his horse and ride east in a gallop along the north side of the fence. When he was about half way along that fence I saw he was carrying a rifle in his right hand. Lahey said to Wyatt: "It looks like there is going to be trouble;" and a

little later said: "It may be his time or mine to go, and if it is mine tell the rest of the kids to remember Della." Della was his wife. When Wyatt and Lahey were within about thirty or forty yards of the northwest fence corner of the eighty-acre rye field Lahey told Wyatt to ride out and see if he could stop Hooper, and Lahey spurred his horse and rode on southeast of the corner. Wyatt rode to the southwest to within ten yards of Hooper, who was then about thirty or forty yards from the corner. Wyatt said to Hooper: "What does this mean?" Hooper did not reply to Wyatt, but started to dismount and called to Lahey: "Get down from there, you yellow son-of-a-bitch; here's where we have it out." When Hooper dismounted he turned his horse loose. Wyatt was then northwest of Lahey and northeast of Hooper and facing toward Hooper. He did not see Lahey dismount, nor how he stood while the shooting was going on, but did see him standing on the east side of his horse, which was facing south, just before the shooting started. Lahey was then about fifteen or twenty yards southeast of the fence corner. Wyatt heard the first shot come from Lahey's direction. Then he heard several shots in a few seconds, but could not say how many were fired by each gun. Both Lahey and Hooper were shooting. When the shooting started Wyatt's horse became difficult to manage. When the shooting stopped Hooper came to Wyatt and said: "You heard him shoot first, didn't you?" Wyatt replied in the affirmative. Just then Mr. Workman rode up and Hooper had Wyatt repeat to Workman the statement to the effect that Lahey fired first. Wyatt then stated that he didn't want "to be into this in any way," and Hooper told him then to just go on like he didn't know anything about it. Hooper asked Workman to go over and see how Lahey looked. Workman rode over to where Lahey lay on the ground, about thirty or forty yards southeast of the fence corner, and came back and reported that Lahey was dead. Soon after that Wyatt went to "Uncle Jimmie" Lahey's, where he saw Ted Rowland and told what had happened.

Mr. Workman testified: After Lahey and Wyatt talked with him, and Lahey had said: "Let's go," or "We better be going," they rode off to the south and a little to the east. When they were about fifty yards away, riding side by side in a gallop, he noticed Hooper about fifty yards east of the gate at the west end of the fence and fifty or sixty feet north of the fence, riding in a dog trot southeast on the north side of the fence. Hooper and Lahey came to within

about thirty or forty yards of each other, right at the fence corner, Hooper about thirty yards east and Lahey fifteen to twenty feet south of the corner. He heard shots fired by Lahey and by Hooper; Lahey shot twice before Hooper shot. He was then eighty to one hundred yards north of them, and perhaps sixty yards north of Wyatt. He had ridden down there in a gallop from where he had talked with Lahey and Wyatt because he knew Hooper and Lahey had had trouble—both of them had told him about it. He first noticed Hooper had a gun in his hand when he jumped off his horse; it was a rifle. He saw Lahey jump from his horse, unbutton his overalls and take a gun out from underneath them. Lahey was then standing on the east side of his horse, facing west. The horse was then headed south. Lahey held the bridle reins in his left hand, but held the gun in both hands, across his horse in front of the saddle, and fired twice in the direction of Hooper. At that time the witness was not looking at Hooper. Just after that he saw Hooper standing on the ground with his rifle in his right hand, saw him raise it and fire three times toward Lahey. There was no noticeable period of time between the shots fired by Lahey and those fired by Hooper; it was "just right now." The witness heard no conversation between Hooper and Lahey prior to the shooting. He thinks if there had been such a conversation he could have heard it, since he was only eighty to one hundred yards away. At the second shot fired by Hooper, Lahey's horse began plunging and jerking Lahey, who staggered, possibly from the jerking. Lahey fell twenty or thirty yards southeast from where he was when the shooting started; the horse had jerked him. After the shooting the witness rode to where Hooper and Wyatt were. Hooper asked Wyatt if he had seen what was done. Wyatt answered that he had, and said to Hooper: "He shot at you twice before you shot." Hooper said to witness: "Did you hear this, Bert?" and the witness answered that he did. Hooper asked him to ride over and see Lahey. He did so and came back and reported to Hooper that Lahey was dead. Then all three of them went over near Lahey. Wyatt said: "I don't want in on this at all," and Hooper replied: "They will sure want you." Wyatt then asked how he could get out of the pasture, and Hooper told him to "go right south the way you came in." When riding toward the fence corner Lahey had spurred his horse, and when he passed the fence corner the horse was going about as fast as he could. Wyatt was thirty yards behind. Lahey dismounted about twenty

feet south of the fence corner. Hooper was off his horse when Lahey fired. After Hooper's second shot Lahey's horse lunged and jumped. Lahey had his right hand across his left arm trying to shoot. His horse was south of him. Hooper's horse came up to Workman. Lahey's horse got loose when Lahey fell and went off east near the river, where it was found dead a few days later. The witness stayed by Lahey's body until the coroner came that afternoon. At the time of the shooting witness heard Lahey say in a loud voice: "You get him; you get him."

Hugh Hooper, defendant, testified: The morning of the homicide he started his hired man McKeegan to drilling rye in the eighty-acre field south of the forty acres on which the white house was situated, then rode to the pasture, met Workman near the northeast corner of the pasture; together they started to find the steer that had been sick. They rode leisurely southwest. As they approached the river they saw south of them, about a quarter of a mile in the pasture, two strange men, one dressed in white, riding east, perhaps a little northeast; passed within two or three hundred yards of them; did not recognize the men or their horses; they did not speak. The grass and weeds were high in the low places. Workman and he separated, Workman going northwest and he southwest, looking for the sick steer. He went along the north side of the rye field; noticed McKeegan had finished drilling in that field and had gone to the field west of the white house, through two gates which witness knew he could not close, as he was working young mules. Witness went and closed the gates, one on the west side of the rye field and two at the corner near the west end of the fence separating the rye field from the forty-acre tract on which the white house was situated. As he closed the gates at the corner he noticed three men on horses at a point east of the white house; one he recognized as Workman; saw the man in white and another man, neither of whom he knew, and started to ride to them to see who they were and what their business was. He had gone about fifty yards toward them when the man in white and the man with him started to ride south; he then directed his course southeast toward the eighty-rod fence on the north side of the rye field; he wanted to find out who those men were; he had known Frank Lahey thirteen years and knew he rode sitting erect in the saddle; the man not dressed in white rode slumped over and crouched forward in the saddle. Witness spurred his horse to a faster gait. About this time the man in dark clothing, who proved

to be Frank Lahey, spurred his horse and rode ahead of the man dressed in white, so as to be about thirty-five yards ahead by the time Lahey got to the corner. The man in white stopped. When witness was about seventy-five yards from the fence corner he recognized Lahey. Lahey rode south of the fence corner about thirty or forty feet, jerked his horse to a standstill, jumped off on the east side, reached in his clothing and pulled out a gun. The witness dismounted, walked around in front of his horse and took his rifle out of the cinch straps of his saddle, where he carried it, butt forward, under the right fender. By this time Lahey had fired toward him twice, holding his gun in both hands over the withers of his horse. Witness was on the ground when Lahey fired. Witness believed himself to be in imminent danger; that Lahey was trying to kill him. He then started shooting, and fired three times. He thinks the first shot did not take effect. When he shot the second time Lahey's horse jumped and began to run around in front of Lahey, who held the bridle reins in his left hand trying to hold his horse, which was jumping, and was holding his gun over his left arm trying to aim at witness; the horse was no longer between Lahey and witness; Lahey was crouched over aiming at witness when he fired the third shot. This all happened pretty quickly, "a matter of a few seconds." While the shots were being fired Wyatt's horse was excited, lunging and jumping about thirty-five or forty yards northeast of witness. Wyatt had said nothing to witness just before the shooting; witness did not take the gun out of the saddle straps before he got off his horse, which was the first time he had taken it from his saddle that morning. Witness did not say to Lahey: "You yellow son-of-a-bitch, get down here and we will shoot it out;" he used no language at all; "there wasn't a word spoke." He was asked: "Were you in the habit of carrying this rifle in your saddle when you went out?" He answered: "Well, when I carried it on my saddle most of the time, a good deal of the time, I put it on there."

Jack McKeegan was working for Mr. Hooper as a farm hand. On the day of the homicide he was drilling rye with a team of young mules in the field south of the forty acres on which the white house was situated. He finished drilling that field about 10 o'clock in the morning, drove through the gate, without closing it, at the northwest corner of the field, and began drilling in the field west of the white house. While working in that field he saw Hooper

ride from the pasture and close the gate near the south end on the west side of the first-mentioned rye field; also saw him close the gates at the northwest corner of that rye field and ride into the pasture and start toward the three men on horses about 150 yards east of the white house. He saw two of those men start to ride south in a gallop, and as they neared the fence corner one of them rode out in the lead. He saw Hooper ride at a trot east along the north side of the fence. He was too far away to hear any shooting, or anything that was said, and did not know of the homicide until he went in to dinner and Hooper told him.

The distance which Lahey traveled from the knoll, where he talked with Workman, to the fence corner where the shooting occurred, was measured to be 758 feet. The distance Hooper traveled from the gate at the northwest corner of the rye field to the corner where the shooting occurred was 1,279 feet. Hence, Hooper necessarily traveled faster than Lahey, whose horse part of the time was on the run.

On the afternoon of the shooting Workman pointed out to a deputy sheriff where the men stood while shooting. The officer picked up three empty 25-20 rifle shells at the place he was told Hooper stood, and two empty .32 automatic pistol shells and one loaded shell indented by the firing pin of the revolver at the place where he was told Lahey stood. From all the testimony it appears Lahey fired twice and tried to fire the third time, but the shell did not explode, and that Hooper fired three times, the third shell striking and killing Lahey.

There was evidence on defendant's behalf that Hooper had a good general reputation as a peaceful, law-abiding citizen, and that Frank Lahey had the general reputation of being quarrelsome and of fighting, especially if he were drinking, as he sometimes was. However, it was Hooper who was fined and put under a peace bond for fighting Lahey, and there is no evidence that either of them ever had any trouble or fights with anyone else.

Soon after the shooting Hooper went home. That evening he went to the county seat and told the sheriff he had shot and killed Lahey. He was placed in jail until he gave bond, which he did in a few days. He told the deputy sheriff where his rifle was, at his home, and the officer went there and got the gun—a 25-20 Stevens repeating rifle. Soon after noon on the day of the homicide the coroner, having learned of the shooting, impaneled a coroner's jury

and went to the scene of the shooting and started to hold a coroner's inquest. The county attorney was away from home, but a Mr. Wesley, who had formerly been county attorney, went with the coroner and the jury. He asked Carrie Hollingsworth, stenographer in the law office of Mr. Stubbs, who was then in Colorado, to go out there and take stenographic notes of the testimony. The coroner's jury assembled at the scene of the shooting and examined the body of Frank Lahey, which was still lying where it fell. His pistol, a .32 automatic, was a few feet from him. Workman, Wyatt, and perhaps others, were interrogated by Wesley, and gave testimony before the coroner's jury. Miss Hollingsworth took stenographic notes of this testimony. After the two witnesses had testified to the cause of death of Frank Lahey the coroner adjourned the inquest to meet at the county seat the next morning. By that time the coroner had concluded there was no question about the cause of death of Frank Lahey and no necessity of completing the coroner's inquest, and it was adjourned without the coroner's jury making any finding. The only record made by the coroner consisted of notations of what he did.

Directly after the hearing that afternoon before the coroner's jury the body of Frank Lahey was taken to a mortuary, where an autopsy was held, which disclosed that a bullet had entered his back between the eleventh and twelfth ribs about two inches to the left of the center of the spinal column and was lodged in the top of the fourth rib on the interior of the chest wall in front, a little to the right of the center of the chest, and in its course had cut the abdominal aorta, causing death. Thereafter, in due course, Hooper was arrested, charged with the murder of Lahey. The case was set for trial in March, 1932, at which time defendant filed a motion for a change of venue on account of the prejudice of the inhabitants of the county. On a hearing of that motion it was denied. Owing to the illness of defendant's leading counsel the trial was continued a time or two and it was finally held in the latter part of June, 1932, with the result previously stated.

Turning now to the questions argued on this appeal. Appellant contends that the court erred in refusing a change of venue. The application was made under R. S. 62-1318 to 62-1321. Affidavits of twenty-five residents of Grant county and sixteen of Haskell county were filed on behalf of defendant, stating in general terms that the Lahey family had resided in that part of the country for

many years and had many members by blood or marriage situated in various parts of Grant county; that the family was influential and had many friends; that the case had been much discussed, and affiants expressed the view that an impartial jury could not be selected in the county. Twenty-seven counter affidavits were presented on the part of the state from various citizens of Grant county which set forth affiants' means of knowledge and that they knew of no prejudice or ill-feeling against Hooper in their respective vicinities; that while the case had been talked to some extent detailed facts and circumstances of the homicide were not generally known, and affiants expressed the view that fair and impartial jurors could be obtained. The court, after considering the motion and the evidence in support and opposition thereof, overruled the same. The matter, of course, was tried to the court. The well-established rule is that before a change of venue to another county can be granted it must affirmatively appear that such prejudice exists as will be reasonably certain to prevent a fair trial. (*State v. Parmenter,* 70 Kan. 513, 516, 79 Pac. 123; *State v. Bassnett,* 80 Kan. 392, 102 Pac. 461.) The ruling of the court upon this question will not be disturbed when supported by competent evidence, as it was here. The view that the ruling of the court was not erroneous is sustained by the fact that when the case was called for trial no extreme difficulty was experienced in getting a jury.

Appellant complains that the court overruled his challenge to the array of jurors. A panel of twenty-four jurors was drawn for the regular session of court in March. In April, when it was thought this case would be tried, an additional panel of sixty-five jurors was drawn. In making the order to draw that panel the court directed that no one be placed on the panel who was a resident of Howard township. That was the township in the southeastern corner of the county in which Hooper and the Laheys lived and in which the homicide occurred. The court has statutory authority to so limit a jury panel. (R. S. 43-123; *State v. Waldron,* 118 Kan. 641, 236 Pac. 855.) About twenty-five jurors drawn on this last panel resided in the county seat. Appellant's real complaint is that such a large number of the panel was from the county seat, where the county officials and the attorney employed to assist in the prosecution resided, and where it is contended the case had been discussed frequently. Evidence disclosed that this panel of jurors was regularly drawn by the proper officials. The fact that a large

percentage of them happened to reside at the county seat perhaps was more accidental than otherwise; the county has a population of a little more than 3,000 and the county seat is the more thickly populated portion of the county. At any rate there is no showing that the drawing of the jury was in any way illegal or irregular.

Appellant next complains that the court overruled his challenges for cause to seven prospective jurors, only one of whom, C. W. Bamber, served on the jury. His examination showed that he had lived in Grant county three years, having moved there from Springfield, Colo. Most of the time he had been in Grant county he had worked for the telephone company or the electric light company as a lineman. On one or two occasions while he was working for the telephone company, between August, 1930, and May, 1931, he had been at the Jimmie Lahey residence to repair the telephone or telephone line. Otherwise he was not acquainted with any of the Laheys, nor with Hooper. At the time of the trial he was living sixteen miles northeast of the county seat, working by the month on a farm. He was a married man with two children. The day of the homicide he was working on a light pole in the county seat. He heard the deputy sheriff say to someone on the street that a man had been killed in the country and he would have to go out there. Later he had heard the case discussed by others, briefly, as many as three or four times in Ulysses, and he had read what was printed about it in the local papers. From this discussion and reading he had an opinion that Hooper shot and killed Frank Lahey; that he shot willfully and intentionally; but he had no opinion as to whether the shooting was excusable, or justifiable, nor as to whether it was unlawful, nor as to whether Hooper was guilty as charged in the information; neither did he have any opinion as to whether the shooting was done premeditatedly, or with malice aforethought, or because of any quarrel or ill-feeling the parties had toward each other. He understood that it was not every killing of a human being that was unlawful; that the court would instruct the jury on the law of the case, and said he would follow those instructions; that he believed in the doctrine of reasonable doubt and would give the defendant the benefit of that doubt; that if the court instructed the jury as to the elements of the offense which the state must prove beyond a reasonable doubt before defendant could be found guilty he would carefully consider such instructions and require the state to so prove each of such elements. He had no bias or prejudice in the matter

and knew of no reason why he could not sit as a juror and give both the state and the defendant a fair and impartial trial; that he would do so if retained as a juror. He gave answers to many other questions propounded to him touching his qualifications, tending to show he was qualified to sit as a juror. Appellant argues that because the juror had an opinion that Hooper shot Lahey willfully and intentionally that he was disqualified as a juror. That was never a controverted issue in the trial of this case. It was admitted by the defendant on the evening of the homicide when he first came to the sheriff and gave himself up, and at various times in the preliminary proceedings. It was intimated, if not definitely stated, by defendant's counsel in their examination of jurors. It was stated by defendant's counsel in his opening statement, and testified to by the defendant on the witness stand.

The pertinent statute (R. S. 62-1409) reads:

"It shall be a good cause of challenge to a juror that he has formed or expressed an opinion on the issue or any material fact to be tried."

Counsel for appellant, displaying extraordinary diligence, have cited our many decisions dealing with the opinion or impression of a prospective juror as to the issue or some material fact of the case to be tried formed from what he had heard or read of the case; have quoted from many of the decisions, and have argued earnestly that this juror was disqualified. We shall not attempt a résumé of these decisions, nor to write a thesis on the subject. Two points, well settled by our former decisions, are determinative of the question before us: (1) The words "issue" and "material fact to be tried," as used in the statute (R. S. 62-1409) just quoted, mean controverted issue, or controverted facts to be tried. This is illustrated by the language of Justice Brewer, speaking for the court, in *State v. Spaulding*, 24 Kan. 1, where a city clerk was being prosecuted for embezzlement. It was said:

"So far as the fact that defendant was city clerk is concerned, we do not think actual knowledge thereof would disqualify. There are facts in many cases which must be proved, and yet facts which all men know. The fact that a certain party is an incumbent of a prominent public office, is one which would be difficult, if not impossible, to find a citizen ignorant of. In a prosecution for malfeasance in that office, must the knowledge of such incumbency disqualify a juror? If a public building is destroyed by fire, every one knows of it. Could no man sit as a juror upon the trial of one charged with setting it on fire who knew that the building had been burned?" (p. 5.)

In *State v. Brown,* 15 Kan. 400, the juror on his *voir dire* answered in the affirmative this question: "Have you formed or expressed an opinion that Phillips, the deceased, was killed, and that Brown, the prisoner, killed him?" In the opinion the court said: "The question whether the defendant killed Phillips was a 'material fact to be tried.' It was, indeed, one of the principal facts in this case." It was held the juror was disqualified. That case was distinguished in *State v. Wells,* 28 Kan. 321, where the juror on his *voir dire* said that he "was convinced that William N. Waddell (deceased) was dead," "and that defendant had killed him," and "that it would require a great deal of evidence to remove this conviction." The record, however, disclosed that the death and killing by defendant was conceded. Defendant's counsel stated to the jury "that it would appear from the evidence that defendant had killed the deceased, but that it would be shown that the killing was done in self-defense." In the opinion the court said:

"And if the defendant, by his counsel, had not conceded that he killed the deceased, such killing would have been a very material fact in issue in the case, and a very material fact to be tried. As the fact of the killing, however, was everywhere conceded in the present case, as it was not in reality a material fact in issue in the case, as it was not a fact contested by the defendant before the jury, but was a fact admitted and confessed to the jury, we think the court below did not commit any material and substantial error in overruling the defendant's challenge for cause." (p. 323.)

In *State v. Gould,* 40 Kan. 258, 264, 19 Pac. 739, several jurors on their *voir dire* expressed an opinion that defendant had shot and killed his wife. The fact that he did so was not controverted. The defense was insanity at the time of the homicide. The prospective jurors had no opinion upon that question. As this was the only controverted question in the case the court's action in overruling defendant's challenges for cause was held not to be material error.

In *State v. Sorter,* 52 Kan. 531, 34 Pac. 1036, the defendant, charged with murder, admitted killing the deceased, but claimed he was justified on the ground of self-defense. Several jurors in their *voir dire* stated they had an opinion that the deceased had been shot and killed by defendant, but had not formed or expressed any opinion as to the guilt or innocence of the defendant. It was held the court committed no substantial error in overruling the challenges for cause.

In *State v. O'Shea,* 60 Kan. 772, 57 Pac. 970, the pertinent syllabus reads:

"The mere fact that a person called as a juror had formed or expressed an opinion that the defendant shot and killed the deceased did not disqualify him as a juror, where the shooting and killing was conceded by the defendant, who claimed that it was done in self-defense." (¶ 1.)

In *State v. Morrison*, 67 Kan. 144, 72 Pac. 554, a murder case, where a defendant admitted the killing and justified it on the ground of self-defense, it was held:

".  .  . the act of killing is not the issue to be tried in the case, and a juror who, in his examination upon his *voir dire*, states that he has formed or expressed an opinion as to the guilt of defendant is not for that reason alone disqualified, if from his entire examination it clearly appears that such opinion is based upon the belief that defendant killed deceased, and that the juror has neither formed nor expressed any opinion as to whether the defendant was justified in taking the life of deceased, as that is the material fact or issue to be tried." (Syl. ¶ 3.)

This principle has never been deviated from in this state and is followed elsewhere. *State v. Draper*, 27 P. 2d 39, 49 (Utah), and *State v. Hoffman*, 94 Mont. 573, 23 P. 2d 972, where our decisions, with others, are cited and followed.

(2) The determination of the question whether a prospective juror is qualified to sit in a case is a trial of that question to the court (R. S. 62-1410). The trial court's decision on that question will not be disturbed on appeal unless disqualification appears as a matter of law, or it is disclosed that there has been an abuse of the court's discretion. (*State v. Stewart*, 85 Kan. 404, 116 Pac. 489.) "It is the mind of the court which must be satisfied that the challenged juror is free from bias and prejudice." (*Morton v. The State*, 1 Kan. 468, 472.) (See, also, *State v. Molz*, 91 Kan. 901, 139 Pac. 376; *State v. Mullins*, 95 Kan. 280, syl. ¶ 6, 147 Pac. 828; *State v. Tucker*, 137 Kan. 84, 91, 19 P. 2d 346.) Applying these principles, it was not error for the court to overrule defendant's challenge for cause to the juror C. W. Bamber.

Six other prospective jurors answered questions on their *voir dire* substantially as did the juror Bamber. Defendant challenged them for cause. It was not error for the court to overrule those challenges. One of these, J. H. Titus, in the course of his examination stated that his wife is a cousin to the wife of Jimmie Lahey. No special attention was given to the statement at the time, and we are unable to find from the record that the trial court's attention was ever called to that fact as being a ground for challenge for cause. The challenge was "to this juror on his whole examination." It directed

the court's attention to no specific ground of challenge. Appellant now contends the juror was disqualified under our statute (R. S. 62-1406), which reads:

"Where any indictment or information alleges an offense against the person or property of another, neither the injured party nor any person of kin to him shall be a competent juror on the trial of such indictment or information; . . ."

We would be justified in declining to determine this question, since no point was made of it in the trial court, or if it can be said to have been made it was buried in the general language used in challenging the juror and was never again brought to the court's attention. A party should fairly and explicity call the attention of the court to a point on which he relies. (*State v. Bell*, 121 Kan. 866, 870, 250 Pac. 281, and cases there cited.) But since we are not urged to take this view we will consider the question.

The Jimmie Lahey mentioned by Titus in his examination obviously is the brother of Frank Lahey, as he is elsewhere so referred to in the evidence, and not the father of Frank Lahey, as he appears always to be referred to as "Uncle Jimmie," although the matter was given so little attention that the distinction was not brought out in the examination of Titus. Neither was it brought out whether the wife of Titus is a first, second, or forty-second cousin to the wife of Jimmie Lahey.

The word "kin," as used in our statute (R. S. 62-1406), above quoted, and in a similar section of our civil code (R. S. 60-2906), appears never to have been defined in any of our decisions, although a part of our law since 1859 (Laws 1859, ch. 27, § 181; Comp. Laws 1862, ch. 32). One may be related to another by consanguinity, that is, through blood line; or by affinity, that is, through marriage. The primary and ordinary meaning of the word "kin" is related by the ties of consanguinity (*State v. Tucker*, 174 Ind. 715, 93 N. E. 3; 35 C. J. 914; Bouvier's Law Dict.). At common law kinship by consanguinity within the ninth degree, as computed by the civil law, disqualified a juror (*Bailey v. Turner*, 108 Kan. 856, 860, 197 Pac. 214; 35 C. J. 317). Perhaps our statute (R. S. 77-201, ¶ 28) would limit that to second cousins. But we are not concerned here with any degree of kin by consanguinity, for it is not even contended any such kinship existed. If we apply to the word "kin" used in the statute in question its common and ordinary meaning the juror was not disqualified. In many states the statutes

provide that a juror related by consanguinity or affinity within a stated degree is disqualified. (See cases collected in American Digest, Jury, § 90.) The first statute on that question in this state (Stat. Kansas Territory 1855, ch. 92, § 12), commonly known as the "bogus statute" because of its general lack of recognition by the citizens of the state, provided: ". . . No person . . . who is of kin to either party . . . within the fourth degree of consanguinity or affinity, shall be sworn as a juror. . . ." But this, as we have seen, was superseded by the statute in 1859, which, with slight change not here important, is our present law.

The word "kin" is sometimes used in a general sense to include relationship by blood or by marriage. (35 C. J. 914; Bouvier's Law Dict.) A Missouri statute like ours has been held to apply to kin by blood or marriage (*State v. Walton*, 74 Mo. 270; *State v. Stewart*, 296 Mo. 12, 246 S. W. 936, 939). And in *State v. Tart*, 199 N. C. 699, 155 S. E. 609, it was held that relationship by blood or marriage within the ninth degree disqualifies. Hence, we will examine the qualifications of the juror Titus, using the word kin as including relationship by marriage. Affinity is the relation which one spouse, because of the marriage, has to the blood relatives of the other. Degrees of relationship by affinity are computed as are degrees of relationship by consanguinity. The doctrine of affinity grew out of the canonical maxim that marriage makes the husband and wife one. The husband has the same relation, by affinity, to his wife's blood relatives as she has to them by consanguinity, and *vice versa*. The doctrine, however, as originally outlined, which is as above stated, never went so far as to hold that a husband (or *vice versa* as to the wife) became related by affinity to a spouse of a blood relative of the wife. (2 C. J. 377.) It is true a few cases have so held (*State v. Joseph B. Wall*, 41 Fla. 463, 26 So. 1020), but the great weight of authority is to the contrary. "Blood relations of the husband and the blood relations of the wife are not related to each other by affinity." (2 C. J. 378.) "The affines of the wife are not those of the husband, nor are the affines of the husband those of the wife." (2 Stephens Commentaries, 285.)

In *Central Railroad Co. v. Roberts*, 91 Ga. 513, 18 S. E. 315, a juror was held not to be incompetent because his stepdaughter married the brother of the plaintiff. The marriage established no relationship or affinity between the juror and the plaintiff. In the opinion it was said:

"Marriage will relate the husband by affinity to the wife's blood relations, but will not relate the husband's brother to any of her relations. The husband of the juror's stepdaughter was not related to the juror, but only to the juror's wife. The husband's brother, the plaintiff, was further off still; he was not related even to the juror's wife.

> "The groom and bride each comes within
> .The circle of the other's kin;
> But kin and kin are still no more
> Related than they were before." (p. 516.)

See, also, *Carl S. Strickland Co. v. Union Bkg. Co.*, 42 Ga. App. 645, 157 S. E. 115; *Carpenter v. State*, 34 Ga. App. 133, 128 S. E. 687; *Bliss v. Caille Brothers Co.*, 149 Mich. 601, 113 N. W. 317, 319; *Wolfe v. Commonwealth*, 229 Ky. 385, 17 S. W. 2d 219; *State v. Chandler*, 178 La. 7, 150 So. 386; *Farmer's Nat. Bank v. J. W. Wallace & Co.*, (Tex. Civ. App.) 263 S. W. 1105; *Gantt v. Belk-Simpson Co.*, 172 S. C. 353, 174 S. E. 1. The juror Titus was not related by affinity to Jimmie Lahey—much less to Frank Lahey, the deceased. It was not error for the court to overrule defendant's challenge for cause.

Titus did not sit as a juror in the trial of the case. He and five other persons challenged for cause by the defendant, which challenges were overruled, were later challenged peremptorily by defendant. Of the twelve jurors who heard the evidence and reached the verdict only one, C. W. Bamber, was challenged for cause, and as to him we have held the court properly overruled the challenge. Our constitution (bill of rights, § 10) guarantees to an accused a trial by an impartial jury. That is all the accused can constitutionally demand. (16 R. C. L. 291.) While our statutes contemplate the use of peremptory challenges on jurors qualified for cause, error in the court's ruling on a challenge for cause, especially if the soundness of the ruling is seriously debatable, should not require a reversal of judgment of conviction, if in fact, as here, the defendant had a trial before an impartial jury.

Several questions are raised respecting the admission of evidence: (1) On the cross-examination of Workman, a witness for the state who had testified with respect to the location of the parties about the time of the homicide, was asked if Jack McKeegan was on the outside of the pasture. The court sustained plaintiff's objection as not being proper cross-examination. There was no error in the ruling. More than that, the testimony as a whole left no room for any doubt as to where McKeegan was. (2) A deputy sheriff, called

as a witness for the state, testified to having picked up shells at the places where Workman told him Lahey and Hooper stood at the time of the shooting. He spoke of those places as the "tracks" of the parties, and testified Workman told him those were Hooper's tracks. Defendant's motion to strike out the testimony as hearsay was overruled. While technically it was hearsay, the ruling was not error, for there is no serious controversy as to where the parties stood. (3) The court, over defendant's objection, admitted in evidence the rifle used by Hooper. We see no error in that ruling. (4) A witness called by defendant was asked, on cross-examination by the state, a few questions about litigation he had previously had in the courts. Defendant's motion to strike out this testimony was overruled. The questions were preliminary in their nature, and perhaps went slightly to the credibility of the witness. The ruling of the court was proper. (5) A character witness called by defendant, after stating he knew defendant's general reputation in the community as a law-abiding citizen, was asked to state what it was, and replied that he had "never heard a disparaging word said against Hooper by anyone." On motion of the prosecuting attorney this answer was stricken out as not being responsive. This ruling was inaccurate. (*State v. Patterson*, 112 Kan. 165, 172, 210 Pac. 654.) Counsel for defendant then called the attention of the witness to the fact that the court had struck this answer because it was not responsive and reframed the question and procured from the witness appropriate answers. Such error as there was in the ruling was of no consequence. (6) Complaint is made that the state was permitted to impeach the witness Workman, called by the state. This is not what happened. A foundation was laid for the impeachment as to one or two questions, but it never was followed up. Another witness for the state was permitted to be called to correct a statement he had made in his former testimony. There was no error in these rulings. (7) The defendant, when a witness, in testifying as to how Lahey was riding just before he dismounted, stated that Lahey "went forward and sort of crouched down, apparently that way." This was stricken out on motion of the prosecuting attorney as being self-serving and stating a conclusion. While the court might have let the answer stand, the ruling is of but little consequence in view of the fact that Hooper, in answer to other questions, stated that Lahey ordinarily rode sitting erect in the saddle, but the man he saw that day was riding leaning for-

ward, crouched over. In other words, his idea of the matter was clearly conveyed to the jury by answers to other questions.

In the course of the trial it developed that counsel for the state had a transcript of the testimony taken at the coroner's inquest on the afternoon of the homicide. Defendant's counsel immediately asked for a copy of it and moved the court to require counsel for the state to furnish them a copy. Counsel for the state declined voluntarily to give a copy of the transcript to counsel for defendant, but were willing to do so if the court ordered them to do it. On the hearing of the motion it developed that the coroner's inquest was never completed and no verdict was returned by the coroner's jury. It further developed that the testimony had not been taken by the order or request of the coroner. Mr. Wesley, a former county attorney, without having any general or special authority to do so, assumed to act in the matter in the absence of the county attorney. He had requested Miss Hollingsworth to take the testimony in shorthand, and she had done so. Later she had transcribed it and given the transcript to the attorneys for the state. It had not been shown to the witnesses and they had not signed it. It does not appear whether she ever was paid for doing this by anyone. At the time she was a stenographer in the office of an attorney, then out of the state, who later was employed to assist in the prosecution. The court held that the attorneys for the state were not required to furnish counsel for defendant a transcript of this testimony. It was not an official document, nor a part of any court record. There was no error in that ruling. (*State v. Laird*, 79 Kan. 681, 100 Pac. 637; *State v. Lawellin*, 125 Kan. 599, 602, 264 Pac. 1035.)

At the trial a controversy arose as to whether the witness Wyatt, at the examination held before the coroner on the afternoon of the homicide, had been asked the question, "What, if anything, was said between Mr. Lahey and Mr. Hooper just a moment before the shooting took place?" and had answered, "If there was anything said I didn't hear it." Defendant produced witnesses who testified that this question had been asked of Wyatt and so answered by him. In rebuttal the state produced a number of witnesses, including each member of the coroner's jury, who testified the question was not asked Wyatt and that he made no answer to it. Wyatt testified to the same effect. The state then called Carrie Hollingsworth, who had taken the stenographic notes of that testimony and later tran-

scribed them, who testified she had been in possession of her steno-graphic notes since they were made and frequently had read them, and that from reading those notes she knew the question had not been asked, and of course that no answer had been returned to it. Defendant objected to the testimony of this witness. We see no reason why she was not as competent to testify on that subject as any of the witnesses who gave testimony concerning it. She was present and heard the testimony, but she relied more definitely upon her stenographic notes, which she had read carefully several times since the taking of the testimony.

Appellant complains that the court did not give an instruction requested relating to testimony of previous good character of defendant. The instruction given, with one change favorable to defendant, was taken verbatim from the instruction considered by this court in *State v. Sorter*, 52 Kan. 531, 34 Pac. 1036, and held not to be erroneous, and again approved in *State v. Moore*, 135 Kan. 164, 9 P. 2d 653. Perhaps both the instruction requested and the one given can be improved upon in wording, but the one given was more complete than the one requested, and it is free from the objections raised against it by appellant.

Appellant requested the court to instruct the jury "that your verdict in this case must be either for murder in the first degree or an acquittal. There is no evidence in this case which will justify a verdict of manslaughter in any degree." The court declined to give that instruction, but gave the usual instructions on first and second degree murder and each of the degrees of manslaughter. Appellant argues that defendant shot to kill, that he had no less intention than to kill, hence if he was guilty of any offense he was guilty of murder in the first degree. The contention puts the case stronger than defendant did in his testimony, and yet it omits the element of premeditation essential to murder in the first degree. It is not argued the instructions of the court on these matters were improper if there was any evidence to support a verdict of guilty for an offense less than murder in the first degree. The contention is there is no evidence to support such a verdict. With this we cannot agree. The testimony on some points was in conflict. Indeed, the jury might have drawn different inferences from some of the evidence over which there was little or no dispute. While there is evidence in the record which would have supported a verdict of guilty of murder in the first degree, it was for the jury to weigh this evidence, pass on

the credibility of the witnesses, and give to the defendant the benefit of reasonable doubt, not only as to whether he was guilty of any offense, but, if there was any reasonable doubt as to his being guilty of the highest offense charged, to give him the benefit of that doubt. Of course, if the defendant was guilty of murder in the first degree, he cannot complain that the jury was more lenient with him than it should have been by finding him guilty of manslaughter in the first degree. (*State v. Bigler*, 138 Kan. 13, 19, 23 P. 2d 598.)

Appellant complains of an instruction given to the effect that if Frank Lahey in good faith thought one of his steers was in the Hooper pasture he would be guilty of no offense if he went in there to look for it, and before Hooper would be justified in assaulting him it was his duty to order Lahey to leave, and if he refused to go defendant would then have a right to use such force as was necessary to put him off the place. The contention is that this instruction injected into the case an issue not raised by the testimony or involved in the trial. Early in the case, and repeatedly throughout the trial, defendant's counsel injected into the case the theory that Lahey was a trespasser in Hooper's pasture; that he had no right there, and sought to bring out that he had come there armed and had brought Wyatt, a stranger to Hooper, as a bad man from Texas, armed; that they had come for the purpose of following Workman and Hooper, and killing Hooper. It is true there was not much evidence to support that view—in fact, much of it was directly to the contrary—yet it was kept prominent throughout the trial. Obviously the instruction was given because the question had been injected into the case by defendant and his attitude concerning it throughout the trial. In view of that it was not an improper instruction to give.

In one of the instructions the court told the jury: "The defendant in this case has admitted the shooting and killing of Frank Lahey, as charged in the information, and the actual killing of said Frank Lahey is therefore removed from your consideration." Appellant complains of that instruction and says that since Hooper was charged with murder in the first degree the instruction that he admitted the killing, "as charged in the information," told the jury outright to find him guilty of murder in the first degree. Obviously this is an afterthought. No one at the trial placed that interpretation upon the instruction. If the jury had so interpreted the instruction the verdict would have been "guilty of murder in the first de-

gree." Even counsel for defendant, in preparing the abstract for this court, did not abstract this instruction. Apparently the point was thought of after the abstract was made. We agree that the words, "as charged in the information," should not have been in the instruction, but in view of other instructions given, embodying elements which the state must prove beyond a reasonable doubt before a verdict of guilty could be sustained, and the fact that the record clearly shows the interpretation of this instruction now contended for was not given it by the jury, or anyone, at the time of the trial, we think the error to be a technical one, which this court is admonished by statute (R. S. 62-1718) to disregard, and we do so.

Lastly, it is argued that the court erred in overruling defendant's motion for a new trial. That depends upon questions previously discussed herein.

We find no material error in the record. The judgment of the court below is affirmed.