No. 41,984

STATE OF KANSAS, *Appellee*, v. LOWELL LEE ANDREWS, *Appellant*.

(357 P. 2d 739)

Opinion filed December 10, 1960.

*Harry Hayward* and *Buford E. Braly*, both of Kansas City, argued the cause, and were on the briefs for the appellant.

*Samuel J. Wells*, assistant county attorney, and *Robert H. Bingham*, of Kansas City, argued the cause, and *John Anderson, Jr.*, attorney general, *Robert Hoffman*, assistant attorney general, and *Robert J. Foster*, county attorney, were with them on the briefs for the appellee.

The opinion of the court was delivered by

JACKSON, J.: In the court below, the appellant was charged with three counts of first degree murder in that it was alleged that he shot and killed his mother, his father and his sister. These astounding matters were all alleged to have happened at the same time. The appellant-defendant pleaded not guilty by way of insanity at the time of the acts charged. Defendant was duly tried upon the charges in the information and the jury found him guilty of murder

in the first degree as to each of the three counts, and further assessed the death penalty upon each of the counts. The district court having approved the jury's verdict and sentenced the defendant to death, he now appeals to this court.

In such an appeal, this court will not feel itself confined by technical rules and would notice any "plain error" whether specified by defendant or not. However, it would appear diligent counsel for defendant have specified every error which conceivably might be thought to exist.

Another facet of the jurisdiction of this court will be noted before turning to the merits of this appeal. In a similar case, *State v. Miller*, 165 Kan. 228, 194 P. 2d 498, the late Mr. Chief Justice Harvey said:

"We are neither authorized nor have we any disposition to debate the question of the wisdom of capital punishment. The legislature determines the policy of the state in that regard and enacts statutes which the courts are bound to follow. The trial court followed the statute in this case." (p. 239.)

On November 28, 1958, the permanent home of defendant Andrews was at the family residence of his father and mother on a suburban farm in Wyandotte county. The address of the home was 6104 Wolcott Drive. Besides the parents and defendant, the family included defendant's sister Jennie Marie. On the above date, defendant was eighteen years of age and was in his second year of study at the University of Kansas. We have been unable to find the exact age of the sister in the record but, from the record, she would appear to have been near the age of the defendant. She was attending a college in Oklahoma.

The 28th of November, 1958, seems to have been part of the Thanksgiving vacation at the University, and the defendant was at home with his family. At about seven o'clock in the evening, without any disagreement with any member of his family, the defendant walked out of the kitchen of the home, up the hall toward his own bedroom and noticed the rest of the family sitting in the front room watching television. Defendant proceeded to the bedroom, strapped on his Ruger .22 caliber revolver and took his semi-automatic .22 caliber rifle in his hands. He then went to the door of the front room and without saying anything, as far as the record shows, opened fire with the rifle upon his family. He shot his mother, his father and his sister in that order. Both the mother and sister were killed in the front room; the father, although wounded,

got up and tried to escape to the kitchen. The defendant pursued his father and finished the father off with the revolver.

It would appear that before the shooting, defendant had raised the window in his own bedroom. After the shooting, defendant removed the screen from this same window and took the contents of dresser drawers and the purses of his mother and sister and scattered them about. The purpose of all this was to simulate the conditions which might appear if an outsider had attempted to rob the home.

Following these acts, defendant dismantled his guns, put them in his father's automobile and drove toward Lawrence taking the state highway and not the turnpike. There is some indication in the record that he avoided the turnpike for fear of recognition.

On approaching the bridge across the Kansas river, defendant stopped near the north end, took the dismantled guns to the bridge, and threw them over the east side which would be over the face of the low dam and into the swift water. He then proceeded in the automobile to his rooming house, where he got his typewriter, making certain to contact both his roommate and his landlady. It would appear that he made these contacts with the purpose of establishing an alibi. Defendant told his roommate that it had taken him more than two hours to drive from his home to Lawrence and that the roads were very slippery. Defendant then went to a picture show. After the show, defendant proceeded to a gasoline station in north Lawrence where he purchased gasoline and apparently made certain that he was recognized. It is suggested that defendant was attempting to strengthen his alibi by making certain the time he left Lawrence for home.

At about 1:00 a. m. November 29, 1958, defendant called the Wyandotte county sheriff's office and reported that the other members of his family had been killed. The county officers immediately came to the scene and found the bodies of defendant's father, mother and sister. The county coroner was called by the sheriff's officers and found defendant rather unconcerned about funeral arrangements for his family. The coroner ascertained that the family were members of the Baptist church of which the Reverend Mr. V. C. Dameron was the minister. Acting upon this information, the coroner telephoned the minister. The sheriff's officers were evidently suspicious concerning defendant and transported him to the sheriff's office. They were immediately joined by the Reverend Mr. Dameron, who

had arrived at the office in response to the telephone call and who either asked or agreed to talk with defendant alone. The sheriff consented to this private conference at defendant's request and provided a private office where it could be held.

Following the conference, the minister came to the door of the office and told the officers that the defendant wished to make a statement. Whereupon, the record shows that the county attorney advised defendant of his constitutional rights and that he did not have to make any statement; and thereafter in response to the questions of the county attorney, with the minister and certain officers from the sheriff's force present, defendant dictated to a secretary, and then read and initialed the pages of a written confession detailing in large measure if not all of the facts which have been recounted above.

The written confession is not set out in the abstract, but the counter abstract shows that it was received in evidence at the trial without any objection upon the part of the defendant. The counter abstract gives only a brief summary of the confession, but it is established that all of the above facts are true, and the defendant makes no contention to the contrary upon this appeal.

The record is silent as to the exact time of defendant's arraignment, but it would appear to have taken place early in the morning of November 29, and it would appear that one of defendant's present counsel was appointed to represent him. Later it appears, this lawyer and the defendant's other counsel were privately employed by defendant.

On February 20, 1959, defendant through counsel moved the district court to appoint a commission to ascertain whether defendant was competent to stand trial. The test of such competency differs from that as to the responsibility for a crime charged against an accused. (See *State v. Severns*, 184 Kan. 213, syl. No. 2, 336 P. 2d 447.) The court promptly granted defendant's motion and appointed three qualified psychiatrists of the Kansas City area to examine defendant and report. The commission reported defendant competent to stand trial. Before the examination of defendant by the commission, defendant demanded the right to be represented by counsel before the medical commission. The court denied this request, and the same is the first matter mentioned in defendant's brief. We find no error in the court's ruling. The commission was to pass upon a medical question at defendant's request, and there

is no evidence that they investigated any legal question relating to the criminal acts of the defendant unless the matter of sanity be such a question. The cases of *State v. Oberst*, 127 Kan. 412, 273 Pac. 490; *State v. Wassinger*, 131 Kan. 316, 291 Pac. 743; and *State v. Seward*, 163 Kan. 136, 181 P. 2d 478, and all cases which have come to our attention, fail to show any deprivation of counsel to this defendant by the court's ruling as to the hearing before the sanity commission or at any other time.

Defendant objects to the fact that on *voir dire* in choosing the jury at the trial, defendant was not allowed to advise the jurors that, if acquitted by reason of insanity, defendant would be sent to the state hospital for the criminally insane. Defendant fails to cite any authority from this or any other jurisdiction to support his contention. True, as contended by defendant, the state was allowed to advise the jury that the penalty on conviction of first degree murder would be life imprisonment or death. But that is because under our peculiar statute, the jury and not the court is empowered to determine the sentence. In cases where the court determines the sentence, such a matter is usually not a subject for the jury's concern (*State v. Lintner*, 183 Kan. 433, 327 P. 2d 848; and *State v. Lytle*, 177 Kan. 408, at 412, 280 P. 2d 924).

The next objections arise in the following manner: On June 14, 1959, defendant advised the trial court that at the time of the trial, defendant's plea would be not guilty because of insanity of the defendant at the time of the alleged crimes. The court was further advised that the Menninger Clinic had agreed to make a medical evalution of defendant's mental condition without charge if the trial court would make an order sending defendant to the Clinic for that purpose; and of course, there was the question of the safe keeping of defendant. All these matters were settled and the trial court readily made the order, subject to the condition, that any *written report* made by the Menninger Clinic as to the mental condition of defendant would not be admissible in evidence unless it could be admitted under the rules of evidence at the time of its independent presentation. It was understood, of course, that the psychiatrists of the Menninger Clinic might be offered as witnesses by the parties. As is shown *infra*, Dr. Joseph Satten testified at great length on behalf of the defendant.

It is argued that on the receipt of the written report from the Clinic, the court should have appointed a *new* sanity commission to

determine defendant's capacity to stand trial and that after Dr. Satten's testimony at the trial, the defendant's motion to stop the trial and appoint a new sanity commission should have been granted.

Apparently defendant is confusing the issues of sanity at the time of the criminal acts with the accused's capacity to defend himself. As pointed out *supra*, the test of capacity at the two different times is not the same. The written report of the Menninger Clinic and the testimony of Dr. Satten was directed to the question of the defendant's insanity or the condition of his mental health at the time of the crime. There was no particular showing that the defendant was unable to defend himself adequately at any time in the written report or in Dr. Satten's testimony. (*State v. Severns,* supra.) Furthermore, the written report was not competent evidence. The writers thereof were not subject to cross-examination and if Dr. Satten was the author of the report, it was not the best evidence because he was present and testified orally. It might be noted also that in Kansas, the question of fact of defendant's insanity at the time of the alleged crime is a question to be tried to the jury hearing the criminal case (*State v. Mendzlewski,* 180 Kan. 11, syl. ¶ 1, 299 P. 2d 589).

Defendant argues quite strenuously that the Reverend Mr. Dameron should not have been allowed to testify concerning the conversations with the defendant while he occupied the role of minister of the church of which defendant was a member. The defendant relies heavily upon the provisions of G. S. 1949, 60-2805, *Fifth,* which reads as follows:

"*Fifth.* A clergyman or priest, concerning any confession made to him in his professional character in the course of discipline enjoined by the church to which he belongs, without the consent of the person making the confession."

The minister testified definitely that there was no course of discipline in the Baptist church by which a member thereof was enjoined to confess his sins to a minister of the church. He further testified that he told the defendant on the night of the crime in the course of the private conference at the sheriff's office that if defendant wished his confessions to be confidential, they would be so treated and the minister would engage a good lawyer for defendant; if defendant wished to make a statement to the county attorney, he would stand by him as his friend and minister. The defendant is reported to have said, "Bring them in," and the minister did so.

The court does not wish to pass upon the existence of a privilege

under the statute upon the above facts. If such privilege did exist, it was waived when the privileged information was communicated to third parties. Here the defendant not only made a written confession to the officers of the law but later told others of certain matters apparently not included in the confession.

One of the principal matters brought out clearly in the testimony of the minister was that defendant said he had killed his family because he hoped to inherit the family property, which was of considerable value, and which in a few years might be worth a quarter of a million dollars; that he had been thinking of this plan since July, 1958; that he thought of using poison and then thought of burning the house but discarded these ideas as being more dangerous in the way of pointing suspicion toward himself.

We assume that the above statements were not included in the written confession but defendant told one of the other witnesses—witness Smiley, the same story and Smiley so testified. Defendant also told this story to Dr. Satten who testified as a witness for the defense.

Where the one making the privileged conversation tells the facts to other third parties, the privilege is waived and the minister, physician or lawyer may be allowed to testify as to the communication made to him. The following cases support the above stated rule: *Cranston v. Stewart,* 184 Kan. 99, at 103, 334 P. 2d 337; *Hutton v. Hutton,* 184 Kan. 560, at 564, 337 P. 2d 635; *Kelley v. Kelley,* 158 Kan. 719, at 728, 150 P. 2d 347, and other authorities cited therein.

Defendant argues that the trial court erred in failing to instruct on lesser degrees of homicide, and in confining the jury to the single crime of murder in the first degree as defined in G. S. 1949, 21-401. The trouble with this argument is that there was an abundance of evidence of premeditation over a period of months. The court is unable to find any evidence to show that defendant's mind was clouded or that it failed to function to the point of not having an intent. It may be noted that defendant's grades in high school and at the University of Kansas were above the average. One does not do such work without the ability to think. The only question was whether this defendant was suffering from some form of insanity to a degree which would render him not responsible for his act. The court is of the opinion that the trial judge did not err in instructing only upon murder in the first degree. We are fully cog-

nizant of the fact, that in many cases under the facts it is error not to instruct on lesser degrees of homicide, but the facts in this case do not compel such an instruction.

Certain questions asked of witnesses during the trial were stricken or not allowed to be answered. For the most part these questions would seem to have been argumentative and not material to the issues of the case. We find no error here, and defendant has not suggested why any of the questions were competent for any purpose.

We come now to the most strenuously argued point in the brief of the defendant. The point argued by counsel is that the rule in this state as to criminal responsibility should be changed.

The learned trial judge in instructing the jury on the test to be applied to the evidence to determine the question of defendant's mental condition at the time of the crime instructed the jury in his 14th instruction as follows:

"14. Insanity, to constitute a legal defense to the charge of crime, means that the defendant is laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he is doing, or if he did know it, that he did not know that what he was doing was wrong because of his mental inability to distinguish between right and wrong, and if these facts exist, then the law does not hold him responsible for his act. On the other hand, if a defendant is mentally capable of understanding what he is doing and has the power to know that his act was wrong, then the law will hold him criminally responsible for it. If this power of discrimination existed, he was sane in the eyes of the law. A person of sound mind and discretion will not be exempted from punishment because he might have been a person of weak intellect or one whose moral perceptions were blunted or ill developed, or because his mind may have been depressed or distracted from brooding over misfortunes or disappointments, or because he may have been wrought up to the greatest and most intense mental excitement from sentiments of disappointment, rage, revenge, or anger. The law recognizes no form of insanity, although the mental faculties may be disordered or deranged, which will furnish one immunity from punishment for an act declared by the law to be criminal, so long as the person committing the act had the capacity to know what he was doing and the power to know that his act was wrong."

The above instruction would seem to be a very accurate statement of the law of this state since the first decisions of this court on the subject. In 1922, a defendant endeavored to obtain a change in the rule as to the defense of insanity, and this court in *The State v. White,* 112 Kan. 83, 209 Pac. 660, said in the syllabus of that case:

"Charged with assaulting her former husband with intent to commit a felony, the defendant interposed the defense of insanity. In substance the court charged that the test of her responsibility was whether at the time of the act

she was capable of understanding what she was doing and had the power to know that her act was wrong. *Held,* following *The State v. Nixon,* 32 Kan. 205, 4 Pac. 159, and *The State v. Mowry,* 37 Kan. 369, 15 Pac. 282, and authorities cited therein, that the instruction was proper; and further *held,* that the court properly refused to instruct that if the defendant knew the act to be wrong, but was driven to it by an irresistible impulse, arising from an insane delusion, she would not be responsible."

Attention may be further directed to *State v. Arnold,* 79 Kan. 533, 100 Pac. 64; and *State v. Moore,* 80 Kan. 232, 102 Pac. 475. The above rule has continued to be approved by this court up to the present time (*State v. Mendzlewski,* 180 Kan. 11, 299 P. 2d 598). It is commonly referred to as the M'Naghten rule because it was formulated in an advisory opinion of the English judges in *M'Naghten's Case* (1843), 10 Clark & F. 200, 8 Eng. Reprint 718. The rule is undoubtedly the measure of the responsibility of a defendant for his criminal acts when insanity is pleaded as a defense in the vast majority of jurisdictions applying the Anglo-American system of law.

Nevertheless, the M'Naghten rule has been the subject of attack by many psychiatrists and by some lawyers and judges. As early as 1870, the supreme court of New Hampshire held in *State v. Jones,* 50 N. H. 369, 9 Am. Rep. 242, that the verdict should be not guilty by reason of insanity if the killing was "the offspring or product of mental disease in the defendant." In 1954, the United States Court of Appeals for the Circuit of the District of Columbia, decided the now famous case of *Durham v. United States,* 214 F. 2d 862, 94 App. D. C. 228, 45 A. L. R. 2d 1430. In the Durham case, the court adopted a rule which was briefly stated in the following language:

"The rule we now hold must be applied on the retrial of this case and in future cases is not unlike that followed by the New Hampshire court since 1870. It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

The adoption of the above rule by so important a court could only increase the discussion of the subject, and defendant urges that we adopt the Durham rule. Yet the M'Naghten rule continues to be the sole test of criminal responsibility in the vast majority of jurisdictions, see annotation in 45 A. L. R. 2d 1447, at page 1452 and supplementary service thereto.

Something must be wrong with the Durham rule when most of the great courts of the common law system reject it. Attention is directed to the two thoughtful opinions in the case of *State v. Lucas,*

30 N. J. 37, 152 A. 2d 50, decided in 1959, in which the supreme court of New Jersey without dissent rejected the Durham rule. We shall not quote from the opinions further than to set out the compilation made by the court of recent cases which have refused to follow the Durham rule. At page 69 of the New Jersey report, the court said:

"Following *Durham* there has been a flood of literature on the issue of criminal responsibility. The critics of the M'Naghten rule were revitalized by the fact that New Hampshire was joined by the District of Columbia. The Durham test has thus far been singularly unsuccessful in winning adherents. It has recently been rejected in the following cases: *People v. Ryan,* 140 Cal. App. 2d 412, 295 P. 2d 496 (Sup. Ct. 1956); *People v. Carpenter,* 11 Ill. 2d 60, 142 N. E. 2d 11 (Sup. Ct. 1957); *State v. Goza,* 317 S. W. 2d 609 (Mo. Sup. Ct. 1958); *Flowers v. State,* 236 Ind. 151, 139 N. E. 2d 185 (Sup. Ct. 1956); *Commonwealth v. Chester,* 150 N. E. 2d 914 (Mass. Sup. Jud. Ct. 1958); *Sollars v. State,* 73 Nev. 248, 316 P. 2d 917, rehearing denied 73 Nev. 343, 319 P. 2d 139 (Sup. Ct. 1957); *State v. Goyet,* 120 Vt. 12, 132 A. 2d 623 (Sup. Ct. 1957); *State v. Collins,* 50 Wash. 2d 740, 314 P. 2d 660 (Sup. Ct. 1957); *Bryant v. State,* 207 Md. 565, 115 A. 2d 502 (Ct. App. 1955). Quite recently Pennsylvania, in a strong opinion, reaffirmed its adherence to M'Naghten, *Commonwealth v. Novak,* 395 Pa. 199, 150 A. 2d 102 (Sup. Ct. March 16, 1959, rehearing denied April 27, 1959). Cf. *Howard v. United States,* 232 F. 2d 274 (5 Cir. 1956); *Andersen v. United States,* 237 F. 2d 118 (9 Cir. 1956); *Sauer v. United States,* 241 F. 2d 640 (9 Cir. 1957), *certiorari* denied 354 U. S. 940, 77 S. Ct. 1405, 1 L. Ed. 2d 1539 (1957). In *Andersen v. United States,* supra, the court held that it was bound by the decision of the United States Supreme Court in *Davis v. United States,* 160 U. S. 469, 16 S. Ct. 353, 40 L. Ed. 499 (1895), and *Fisher v. United States,* 328 U. S. 463, 66 S. Ct. 1318, 90 L. Ed. 1382 (1946), and therefore could not follow *Durham,* but further indicated that it had:

" '. . . no desire to join the courts of New Hampshire and the District of Columbia in their "magnificent isolation" of rebellion against M'Naghten, even though New Hampshire has been traveling down that lonesome road since 1870. See *State v. Pike,* 49 N. H. 399. Rather than stumble along with *Pike,* we prefer to trudge along the now well-traveled pike blazed more than a century ago by M'Naghten.' (237 F. 2d 118 at page 127.)"

The M'Naghten rule has been criticized by some well-meaning people on the ground that it removes from the jury freedom of decision. With all due respect, it must be said that such persons would appear to misunderstand the function of the judge and jury in the trial of a law suit. The function of the jury is to decide disputed questions of fact under the law as given to the jury in the instructions of the court. The court should be able to instruct the jury that the verdict should be one way, if the fact is found to be true, and the other way if the fact is found to be untrue. It is suggested that

the Durham rule is vague and ambiguous in that according to the teaching of most Freudian psychiatrists the court is unable to set any boundary under the Durham rule.

Many psychiatrists maintain, not without reason, that all criminals or people who commit criminal acts are suffering from some mental illness or in lay language are abnormal. Attention is directed to the article *Crime Without Punishment*, by Edward De Grazia in 52 Columbia L. R. 746, in which the learned author notes the contention by eminent psychiatrists, including Dr. Karl Menninger, that criminals in general are suffering from mental illness.

In a book review *Psychiatry and the Law*, 38 Iowa L. R. 687, at 702, Dr. Karl Menninger comments upon the above article as follows:

"For example, Professor Edward De Grazia of Washington recently published in the *Columbia Law Review* a rather sharp criticism of 'the psychiatric argument for abolishment of punishment.' He quotes quite a number of us, including myself, and waxes wroth with us for proposing that one can look at all misbehavior as an evidence of something mentally wrong with the individual. Now, as a lawyer, he looks at 'something wrong' from the standpoint of its social inacceptability, and deplores my point of view that something wrong be looked at as an evidence of the need for treatment. Now he and I do not really differ, I think, if we define 'treatment.' As I use the word, putting a man in jail may be the best possible treatment (or at least one step in the treatment), but again it might not be—indeed, usually isn't. With what he understands me to have said, he disagrees and I agree with his disagreement. In an effort to get across to the public our position that what any one does, even a criminal offender, is the product of many forces which have caused an unendurable internal stress in that man, we psychiatrists have perhaps used the word 'sickness' too loosely. And, in an effort to indicate our dissatisfaction with the effects of pre-measured official punishment as a routine 'treatment' of all misbehaving individuals, we have given the impression, I am afraid, that we don't believe in the propriety of punishment, ever. The word punishment frightens us (doctors) so much that we get unrealistic about it. If one insists on sticking his hand into steaming water, it gets burned. If he kicks an angry dog, he gets bitten. Now he can't blame society for having some of the attributes of boiling water and an angry dog, *i. e.*, it has *its* characteristics and gives fair warning. Society doesn't like to be kicked in the teeth and is certain to attempt to defend itself, by threats of action and by action. I don't think that any psychiatrist would deny that a twenty-five dollar penalty for running a red light has a deterrent effect on most of us. That fact that has always impressed us psychiatrists is that for *some* individuals the penalty that deters *us*, does *not* deter *them!* The mistake we have made is to give lawyers the impression that we believe, therefore, that no penalties deter anyone from anything."

The doctor further points out that the psychiatrists could not take care of the criminals because there are not enough psychiatrists. It is to be noted that Dr. Menninger does not retract any of his opinions as to the mental illness of the average criminal, and we are not arguing that he should do so. But the Durham rule becomes exceedingly vague, if the jury be told that they shall not hold defendant responsible for his criminal acts, if the acts were the product of mental illness, and that the fact that he performed the criminal acts is proof of his mental illness.

The trouble is that society must claim the right to protect itself against the mentally ill. The question is not whether the defendant in this case was mentally ill, but what is the nature and extent of his mental illness?

Again it may be noted, that Freudian psychiatrists tend to discount the existence of the capacity in the individual to exercise his free will. Perhaps, it should be noted also that there are other schools of psychiatry beside the Freudian. It is not for the lawyer to decide between these two schools. We can only wish all of these learned men success in their quest for knowledge in a new field. But, the law has always insisted upon an exercise of will—and an intent in the commission of felonies. The element of intent is particularly true of the crime of first degree murder.

Perhaps, somewhat connected with the proposition of free will, is the contention by some people that the M'Naghten rule merely applies a moralistic concept as a criterion. This has never been thought by the courts, to our knowledge, to be the meaning of the word "wrong" as used in the rule. What is meant is that which is prohibited by the law of the land. A recent decision of the judges of the Queen's Bench in England discussed this matter specifically (*Regina v. Windle* (1952), 2 Q. B. 826 (1952), 2 All Eng. 1).

It would appear to this court, that at the present time, there is no better rule for the protection of society than the one which was applied by the trial court in this case, and which is still approved by the overwhelming weight of authority as shown above.

There is no real contention made in this case that there is not ample evidence to show that the defendant here did understand the nature of his criminal acts, and that he did understand perfectly that these acts were proscribed and prohibited by the laws of the state. This view of defendant's mental condition was not only upheld by the testimony of the two psychiatrists who testified on

behalf of the state and by the minister, Dameron, who likewise testified for the state as to the defendant's mental condition, but actually would not be contrary to the testimony of Dr. Satten, the expert for the defense. If there be any question as to the right of the minister to testify concerning mental condition, see *State v. Mendzlewski,* supra, p. 14-15.

We shall not quote at length from Dr. Satten's testimony, but shall attempt only briefly to summarize his conclusions. In his opinion, defendant is suffering from schizophrenia, simple type. This means there is a split between defendant's thinking and feeling. He understood the nature of his acts, and that they were prohibited by law and that he was subject to punishment. On the other hand, the doctor was of the opinion that defendant felt no emotions whatsoever; that he considered himself to be the most important person in the world; that "in his own private withdrawn world, it is just as right (morally?) to kill a person or a mother as to kill an animal or a fly." It may be noted that at least one of the state's psychiatrists found the defendant's emotions "blunted," and the minister testified defendant never showed sorrow or remorse as a result of the death of his family.

Taking this as Dr. Satten's diagnosis, we think that under this diagnosis, defendant should be held to be responsible for his criminal acts. We cannot say that one who knows the rules of society and the state, may violate those rules without committing a crime simply because in his warped moral concepts of the world, he conceives it to be right for him to do the proscribed acts.

Careful examination of the record in this case has shown no error therein, therefore, the judgment must be affirmed. It is so ordered.