No. 44,547

State of Kansas, *Appellee*, v. Frank Hoy, *Appellant*.

(430 P. 2d 275)

Opinion filed July 12, 1967.

*Charles D. Anderson,* of Wichita, argued the cause and *David S. Knudson, Donald B. Clark* and *Marvin R. Appling,* all of Wichita, were with him on the brief for the appellant.

*Keith Sanborn,* County Attorney, argued the cause and *Robert C. Londerholm,* Attorney General, and *R. K. Hollingsworth,* Deputy County Attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

Fromme, J.: Frank Hoy was convicted of first degree murder (K. S. A. 21-401). A jury imposed a penalty of life imprisonment

(K. S. A. 21-403). The motion for new trial was denied and defendant appeals.

The charge grew out of the shooting and death of Sharon Hoy on July 8, 1965, in the first hour after midnight in the city of Wichita, Kansas. Sharon Hoy obtained a divorce from the defendant and custody of a minor child some nine months prior to her death. She was shot while driving her cream colored Renault automobile on North Estelle Street at approximately 12:22 a. m. Her assailant was driving a 1951 model Chevrolet automobile, dark blue in color. Four witnesses testified the Chevrolet overtook the smaller Renault, forced it over the right street curbing and then proceeded past it and out of sight up the street. The witnesses heard three or four shots fired from the Chevrolet when the two cars were parallel. Although the incident happened when the cars were close to a street light, the witnesses were unable to recognize the driver of the Chevrolet.

Later investigation and laboratory analysis of the two cars established that one of the bullets, fired from within the Chevrolet, never left the car. It hit the upper edge of the lowered window and ranged downward into the interior of the door and was recovered. A second bullet entered the lower left front door of the Renault, passed on through and was recovered from the floor of that car. A third bullet entered the upper left front door of the Renault, passed through the front seat, entered the right front door and was recovered from the inside of that car door.

After the shooting occurred the Chevrolet passed rapidly out of sight to the north. The Renault turned back into the street, hit the left rear bumper of a car parked parallel to the right street curbing and continued slowly up the street to the point where it came to rest against the northeast curbing of the first intersection. About the time the Renault hit the parked car Sharon Hoy was ejected from the left front door of the Renault and fell to the middle of the street. She was first observed by a couple saying their "good-byes" on the front porch of the house where the car was parked parallel to the curbing. She was in a kneeling position in the street. They noticed bleeding and heavy breathing. She managed to rise to her feet and proceeded onto the porch of the house across the street. The people in that house were awakened when she collapsed against their front door. They looked at her crumpled form, saw bleeding and noticed noisy breathing. They immediately called the police. This call was

noted at the police station at 12:22 a. m. Several police officers were at the scene by 12:31 a. m.

An autopsy performed on Sharon Hoy established death as a result of a bullet which entered her left breast, passed through her lung, upper trachea, neck and right shoulder. The doctor who performed the autopsy testified the woman was lying on her right side in the front seat of the Renault when the bullet entered her body.

When the police officers first arrived at the scene they called by radio for additional help. Officer Kenney while proceeding to the scene was advised to be on the lookout for a 1951 dark blue Chevrolet automobile which was wanted in connection with the shooting. On the way to the scene he noticed such a car parked beside a filling station at 17th and Grove streets. This was about eight blocks from the scene. The officer stopped and investigated. He felt the radiator of the car. It was warm. He noticed three people standing in front of the cafe across the street and went to them for information as to the owner and driver of the car. Frank Hoy, the defendant, advised Officer Kenney the car belonged to David Chaney and that the defendant had been driving it. Other officers arrived at the cafe in response to Officer Kenney's report sent in at 12:48 a. m. They talked with the three men in front of the cafe while Officer Kenney returned to the 1951 Chevrolet. He looked through the rear window and saw an empty cartridge case which appeared to be a .32 or a .380 caliber automatic casing. He noticed a hole in the very top of the right front window and a dent in the outside part of the door. He was advised by radio to examine for yellow or cream colored paint and found it present on the right side of the Chevrolet. Defendant was then placed under arrest and taken to the police station. Police laboratory men took over possession of the car after talking with David Chaney, the owner.

Two empty cartridge casings were taken from the floor in front of the rear seat in the Chevrolet. A bullet was recovered from the inside of the right front door panel. Two bullets were recovered from inside the cream colored Renault automobile. Laboratory analysis of the casings and bullets indicated all were fired in and by the same weapon.

The two cars were linked together by visual identification of eye witnesses, laboratory analysis of bullets and casings and laboratory comparison of paint left on these cars by their impact. The murder weapon was never found.

The defendant contends the trial court erred in refusing to instruct the jury on second degree murder and other lesser included offenses.

In *State v. Fouts,* 169 Kan. 686, 221 P. 2d 841, this court said:

"Our statute (G. S. 1935, 62-1447) requires the trial court in a criminal action to charge the jury respecting all matters which are necessary for their information in giving their verdict. Under our decisions, construing its terms, we have repeatedly held that in prosecutions for homicide it is the imperative duty of the trial court to instruct the jury not only as to the offense charged—in this case murder in the first degree—but as to all lesser offenses of which the accused might be found guilty under the information and upon the evidence adduced. This, we might add, is the rule, even though the court may deem the evidence supporting the lesser offense to be weak and inconclusive and notwithstanding a request for such an instruction has not been made. See *State v. Severns,* 158 Kan. 453, 148 P. 2d 488; *State v. Phelps,* 151 Kan. 199, 97 P. 2d 1105; *State v. Gloyd,* 148 Kan. 706, 710, 84 P. 2d 966; *State v. Cunningham,* 120 Kan. 430, 243 Pac. 1006." [p. 692]

Instructions on lesser included offenses have been required in many of the reported cases when the defendant has been charged with first degree murder and the evidence in such case does not exclude every theory of guilt in a lesser degree. (See also *The State v. Clark,* 69 Kan. 576, 77 Pac. 287; *The State v. Winters,* 81 Kan. 414, 105 Pac. 516; *State v. Smith,* 161 Kan. 230, 167 P. 2d 594.)

In many other cases this court has held every theory of guilt on a lesser degree was excluded under the facts of the case. (*State v. Noble,* 175 Kan. 398, 264 P. 2d 479; *State v. Gray,* 189 Kan. 398, 369 P. 2d 330; *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739; *State v. Germany,* 173 Kan. 214, 245 P. 2d 981; *State v. Zimmer,* 198 Kan. 479, 426 P. 2d 267.)

In *State v. Noble,* supra, this court in referring to *State v. Fouts,* said:

". . . It may be said that that case and others cited therein, as well as others mentioned, support the premise and we shall not discuss it further. As applied to the instant case the question is whether there was any evidence adduced that compelled an instruction on G. S. 1949, 21-412. . . ." [p. 400]

The court then reviewed the facts of the case and stated:

". . . As applied to the facts in this case we think it must be held the provision as to manslaughter in the second degree had no application. . . . The trial court did not err in not giving an instruction as to manslaughter in the second degree." [p. 401]

The question in every case must be resolved from the evidence at the trial. If the evidence excludes theory of guilt on any lesser de-

gree then an instruction on first degree murder alone is all that can be required.

In the present case the defendant used an alibi for his defense. He denied all knowledge of the death of his former wife. His evidence, if believed, would have placed him at home in bed with another woman at the time Sharon Hoy was murdered. His alleged bedmate testified in his favor although her testimony was somewhat discredited by the testimony of her husband and two other persons in whose company she had remained throughout the night of July 7 and morning of July 8.

The jury did not believe the alibi testimony. The remaining question to be answered is whether the circumstances surrounding the death of Sharon Hoy excluded a theory of defendant's guilt in any lesser degree. If the killing was committed purposely and maliciously, with deliberation and premeditation, any theory of guilt in a lesser degree was excluded and the instruction on first degree murder alone was proper.

This tragedy arose out of the broken marriage, the fight over custody of an only child and the jealousy of a former husband.

The evidence clearly showed that Frank Hoy shadowed Sharon Hoy to keep advised of her activities. He watched from a distance as she purchased groceries. He inquired of her friends and neighbors concerning her activities. He questioned Sharon about the care of the child and her relationship with Jeff Mitchell. On the morning of July 6 he talked with Sharon on the telephone. Sharon's sister was listening on an extension phone and she heard the defendant tell Sharon, *"I am going to get you, I might do 99 years but you will be in your grave, you won't know about it."*

On the evening of July 7 Sharon Hoy had been parked in the cream colored Renault automobile in Jeff Mitchell's back yard from 10:00 until after midnight. Jeff Mitchell testified they sat in the car and talked. When she left in her car she told him she would call him when she arrived home.

There were four persons who testified they saw the small cream colored Renault approaching at a high rate of speed pursued by the 1951 Chevrolet. They saw the Chevrolet overtake the Renault. The speed and appearance of the cars indicated that Sharon Hoy in the Renault was attempting to outrun the blue Chevrolet. She lost the race and her life as the shots were fired from the blue Chevrolet.

It would be difficult to find another case where the evidence so

thoroughly excluded guilt in a lesser degree. Sharon Hoy's death was accomplished after deliberation and premeditation. She was pursued, overtaken and shot while in her moving vehicle. The acts which effected death were wilfully and maliciously carried out after threats of death were made. No instruction on a lesser degree would have been proper.

The next specification of error is based upon an order of the trial court overruling defendant's challenge of a juror for cause. Betty J. Johnson was examined as to her qualifications to sit as a juror in the case. She stated she had neither formed nor expressed an opinion on any issue in the case but later questions elicited the following information. She considered herself a dear friend of Sharon Hoy and family. She attended the funeral and talked with the relatives concerning Sharon's death. She had some reservation concerning the weight of testimony which defendant might give.

Defendant's challenge of this prospective juror was overruled. At the close of the voir dire examination the challenge was renewed and, with this one exception, defendant passed the panel for cause. Defendant exhausted all twelve peremptory challenges as allowed by K. S. A. 62-1402. He used his first challenge to remove Miss Johnson and she did not sit as a juror. Therefore, no person was allowed to sit as a juror who was unsuccessfully challenged for cause.

In view of our prior case law it is not necessary for us to determine if Miss Johnson should have been removed for cause.

In *State v. Hooper*, 140 Kan. 481, 37 P. 2d 52, seven prospective jurors were challenged by the defendant for cause. Only one of the seven sat as a juror in the case. The others were removed by peremptory challenges. Five of these were removed by the defendant. The court on appeal determined the one person challenged was qualified and held no error resulted. At page 502 of the opinion the court said:

". . . While our statutes contemplate the use of peremptory challenges on jurors qualified for cause, error in the court's ruling on a challenge for cause, especially if the soundness of the ruling is seriously debatable, should not require a reversal of judgment of conviction, if in fact, as here, the defendant had a trial before an impartial jury."

In *State v. Springer*, 172 Kan. 239, 239 P. 2d 944, the court determined a challenge for cause should have been sustained by reason of kinship as specified in G. S. 1949, 62-1406 [now K. S. A. 62-

1406]. In that case defendant exhausted all six of his peremptory challenges. He removed the incompetent juror using one of his peremptory challenges. The court at page 245 of the opinion said:

"The constitutional guaranty is that an accused shall be tried by an impartial jury. The matter of peremptory challenges is merely statutory machinery for carrying out and securing the constitutional guaranty. Error in overruling a challenge to a juror is not ground for reversal unless the accused was prejudiced thereby. The real question is: Was the jury which tried defendant composed of impartial members? In the absence of any objection on the part of defendant to any members as it was finally drawn to try him we cannot say it was not impartial."

In our present case the only juror challenged for cause by the defendant was not allowed to sit as a juror in the case. Under the reasoning and authority expressed in *Hooper* and in *Springer* error, if any, in failing to remove the juror on the challenge for cause, was not prejudicial and no reversible error was committed.

Defendant next suggests it was error because the trial court failed to provide an electroencephalograph suggested by a sanity commission appointed by the court prior to the trial.

Attorneys for defendant petitioned the court for appointment of a commission to determine if defendant was able to "comprehend his position and make a proper defense." Pursuant to the petition two doctors were appointed. They examined the defendant and psychological tests were given. Written reports were filed by the commissioners which set forth the findings upon which they concluded the defendant was able to comprehend his position and make a proper defense. They found he was competent to stand trial.

However, one commissioner inserted an extraneous suggestion in his findings. The suggestion was based upon a statement made by defendant that he had "blackout spells." The commissioner's suggestion to the court was as follows:

". . . The psychological tests also indicate that perhaps further evaluation is necessary if the question arises as to whether or not a fugue state might have existed at the time of the alleged crime. If this question arises, possible electroencephalograms should be done."

A "fugue state" as mentioned in the commissioner's report is defined in Webster's unabridged dictionary (third) as, "a pathological disturbance of consciousness during which the patient performs acts of which he appears to be conscious but of which on recovery he has no recollection."

We note the commissioner's suggestion of the additional test was conditioned upon a question which might arise during the trial. The test was suggested if any question arose that a fugue state might have existed *at the time of the alleged crime.*

What was said in *Van Dusen v. State,* 197 Kan. 718, 722, 421 P. 2d 197, is particularly applicable here, to-wit:

"In approaching this matter it must be kept in mind the sanity of one charged with crime may involve two inquiries which are separate and distinct: First, sanity at the time of the commission of the alleged crime, and, second, sanity at the time of trial. The test of criminal responsibility differs from that of mental competency to stand trial (*State v. Andrews,* 187 Kan. 458, 357 P. 2d 739, cert. den. 368 U. S. 868, 7 L. ed. 2d 65, 82 S. Ct. 80). The test of responsibility for commission of crime in Kansas is what is commonly referred to as the M'Naghten rule, that is, whether the accused was capable of distinguishing between right and wrong at the time and with respect to the act committed (*State v. Andrews,* supra). Insanity at the time of the commission of crime is to be regarded as a defense in the criminal prosecution for such offense and as such it is to be presented and determined during the trial (*Fisher v. Fraser,* 171 Kan. 472, 233 P. 2d 1066), . . ."

The only questions raised by the commissioner related to defendant's competency at the time of the commission of the crime. This is a matter of defense and, as such, it must be presented during the trial. The defense of defendant was an alibi. It was not insanity. At no time during the trial was an issue raised concerning the competency of defendant at the time the crime was committed.

A similar claim of error was made and rejected in *State v. Zimmer,* supra.

Defendant cites *In re Wright,* 74 Kan. 406, 86 Pac. 460, in support of his contention. In *Wright* the defendant had been adjudged insane by a probate court after he had committed a felony and before his preliminary hearing on the felony charge. A writ of habeas corpus was granted at first, but on the rehearing [74 Kan. 409, 89 Pac. 678] the writ was denied. On rehearing the court said the questions raised concerning the onset and nature of the insanity were matters to be presented and determined during the trial of the felony charge. The case does not support defendant's position here.

Defendant contends the verdict was contrary to law since a dermal nitrate test given to the defendant was negative. A dermal nitrate test is an investigative aid sometimes used by law enforcement officers. It is given to determine the presence of burned gun-

powder residue in the pores of the skin. Laboratory specialists who made the test on defendant's hands testified a negative dermal nitrate test might indicate any one of three things. It might indicate defendant had not fired a weapon recently, or his hands were protected by gloves, or the weapon used did not leave evidence of nitrates by reason of its construction.

The testimony of the laboratory experts as to the results of the test was properly submitted to the jury with all other evidence in the case. The negative findings were evidence favorable to defendant, but the weight and effect of the evidence was properly left to the jury. (*State v. Shaw,* 195 Kan. 677, 408 P. 2d 650.)

On the motion for new trial defendant argued the statements made by him after his arrest were improperly admitted in evidence. He insists he was not advised of his constitutional rights and he was not allowed to have his attorney present at that time.

In order to place the questions raised in proper context it should be noted the statements referred to were elicited from defendant during custodial interrogation at the police station. Defendant at all times denied the charges. The statements made by him were in support of his claim of innocence. He accounted for his actions during that night, explained why he was using David Chaney's automobile instead of his own, and denied knowledge of the recent damage to the Chaney car. From his statements one must infer that defendant had possession of this car throughout the night until he was arrested. He admitted ownership of a .32 automatic pistol at one time, but claimed it had been stolen from him three weeks before. He did not report the theft to the police. When told of witnesses who might identify him, he asked how this was possible and said "it was too dark."

These statements were made during the first two hours and twenty minutes after he was taken to the police station. Officers Brierly and Brown handled the interrogation with the occasional help and presence of Officer Puckett. Mary Hawkins, a friend of defendant, was also present during a portion of the interrogation. At the beginning Officer Brierly filled out a sheet of background material on the defendant. He then advised defendant they were going to talk to him about the shooting of his wife. He told the defendant, ". . . anything that he told me that we could testify to in court, he wasn't required to tell anything incriminating to him

and that he could call his attorney if he so desired. . . ."

Officer Brown was not present at first when this advice was given to defendant by Officer Brierly, but he testified as follows:

"Detective Brierly introduced me. to Frank Hoy; I told him that I was Sergeant Brown of the Police Department. Detective Brierly told me in. front of Frank Hoy that he had advised Mr. Hoy that anything he said could be used against him, that he need make no statements, that he had the right to counsel and that we could promise him nothing and intended to threaten him in no way. I again, at that time, reiterated the same rights to Mr. Hoy; he said that he understood. . . ."

These officers testified that after the advice was given no request was made by defendant to call an attorney. At 4:00 a. m. he did ask to call his mother and permission was granted at once. Defendant called his mother and asked her to get in touch with his attorney. Questioning was resumed thereafter until defendant said, "I would rather not say anything until after I talk to my attorney." At that time the interview was concluded. This was at 4:10 or 4:15 a. m. on July 8. The attorney appeared at 9:00 a. m. No further statements were made by defendant.

We note defendant testified that he asked to call his lawyer at 2:00 a. m. when the custodial interrogation began. This was directly refuted by the testimony of Officer Brown and Officer Brierly.

Trial of the case ended October 26, 1965. Defendant relies upon *Escobedo v. Illinois,* 378 U. S. 478, 12 L. ed. 2d 977, 84 S. Ct. 1758, in support of this specification of error. He quotes from page 490 of the opinion as follows:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of 'interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon. the States by the Fourteenth Amendment,' Gideon v. Wainwright, 872 U. S., at 342, [9 L. ed. 2d at 804, 93 A. L. R. 2d 733,] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

It was agreed on oral argument the case of *Miranda v. Arizona,* 384 U. S. 436, 16 L. ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3d 974, does not apply retroactively to this case. (See *Johnson v. New*

*Jersey,* 384 U. S. 719, 16 L. ed. 2d 882, 86 S. Ct. 1772.) Therefore, our decision here relates only to the guidelines in *Escobedo.*

In *Escobedo* that court said:

"The critical question in this case is whether, under the circumstances, the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U. S. 335, 342, [9 L. ed. 2d 799, 804, 83 S. Ct. 792, 93 A. L. R. 2d 733,] and thereby renders inadmissible in a state criminal trial any incriminating statement elicited by the police during the interrogation." (p. 479.)

In that case Escobedo testified he had repeatedly asked to speak to his lawyer and the lawyer was at the police station asking to see his client. The police told the defendant his lawyer didn't want to see him and continued the questioning until damaging statements were elicited. The court noted that testimony of police officers confirmed these accounts in substantial detail. Escobedo's lawyer also testified of unsuccessful attempts to talk with his client during this period from 9:30 p. m. until approximately 1:00 a. m. There can be no doubt, from these facts, of the denial of the right to consult with counsel in violation of the Sixth Amendment to the United States Constitution.

It is quite clear from that decision no custodial interrogation should continue after defendant's request for counsel until counsel is present. No statements, whether exculpatory or inculpatory, elicited from a defendant after denial of a request for counsel are admissible in evidence. Such statements are not considered voluntary when measured by the yardstick of *Escobedo.*

However, this is not our present case. The bald statement of Frank Hoy that he requested permission to call counsel is refuted by the testimony of Officer Brown and of Officer Brierly. In addition, it appears unlikely that the request would be entirely disregarded at first but promptly honored at a later time in view of the fact the interrogation was interrupted while in progress because of defendant's request. At this time defendant did call his mother, not an attorney, and he asked her to get his attorney. It is also noteworthy that the interrogation was resumed but ceased when defendant said he would rather not say anything until he talked with his attorney. Under the circumstances of this case defendant was advised of his right to counsel and was granted permission to use a telephone immediately upon his request. He was properly advised

of his right to remain silent and this right was honored by the officers. Defendant's admissions were voluntary when measured by the yardstick of *Escobedo*. No error appears in this regard.

Objection is made to the admission of physical evidence alleged to have been obtained by an illegal search and seizure of the 1951 Chevrolet automobile taken from the custody of the defendant. This physical evidence consisted of two expended .32 caliber shell casings, paint samples, the right door glass, the bullet removed from inside the right front door and photographic evidence of the car. In support of this contention the defendant cites *Mapp v. Ohio*, 367 U. S. 643, 6 L. ed. 2d 1081, 81 S. Ct. 1684. That case concerned a forcible entry of a personal residence, and seizure of obscene materials from the basement of a two-family dwelling without a legal search warrant. This case and others cited are not persuasive under the facts of the present case.

The physical evidence objected to by defendant was removed from the car. The car was identified by four different eye witnesses as being the car used by the individual who committed the murder. It had been further identified from damage to the right side and from cream colored paint thereon. The cream colored paint was later identified as coming from the victim's car. The .32 caliber shell casings and the bullet damage to the right door glass were visible to the officer as he inspected the car from the outside. Coupled with this we have testimony of the ballistics experts from the police laboratory indicating the .32 caliber slug taken from the Chevrolet car and the two slugs recovered from the Renault car were fired by the same weapon.

In addition the owner, David Chaney, testified he had cleaned the interior of his car two days before and on the morning he left it with defendant the shell casings were not in it, the right door glass and right side of the car were not damaged and there was no cream colored paint on it.

When all of the foregoing evidence is considered there is little question this was the car used by the person who committed the crime. Its use under the circumstances made it an instrument of the crime, a means employed by the murderer to pursue, overtake and shoot to death his victim.

The circumstances of the crime known to Officer Kenney coupled with the evidence viewed by him, when he approached the car and

felt the warm radiator, furnished probable cause for the arrest of the driver of that car. The defendant while in the company of the two men loitering in front of the cafe admitted he had been driving the car. Defendant's arrest was upon probable cause. No search was involved, for the car was seized as an instrumentality of crime and the car itself was seized after the arrest was accomplished.

The rules governing search and seizure were examined in *State v. Wood,* 190 Kan. 778, 378 P. 2d 536. At pp. 789, 790, this court said:

"Where a lawful arrest is made and the person arrested is the driver or in control of an automobile, the automobile may be searched as an incident of the arrest. This includes the whole interior of the automobile and the trunk. The keys may be taken from him to get into a locked trunk. The search of the interior of the automobile and *the seizure of evidence, if incident to a lawful arrest, is reasonable, and whatever is found upon his person or in his control, which it is unlawful for him to have, and which may be used to prove the offense, may be seized and held as evidence in the prosecution.* (See *Weeks v. United States,* 232 U. S. 383, 392, 58 L. Ed. 652, 34 S. Ct. 341; *Carroll v. United States,* 267 U. S. 132, 158, 69 L. Ed. 543, 45 S. Ct. 280; and *State v. Carr,* 114 Kan. 442, 218 Pac. 1007.)" [Emphasis added.]

A distinction is made between seizure of the instruments used to commit crime and seizure of private books and papers to be used only as evidence. This distinction was pointed out in *State v. Blood,* 190 Kan. 812, 378 P. 2d 548, as it applies to seizure of stolen goods, counterfeit coin, lottery tickets and implements of gambling. It may likewise apply to seizure of an automobile used by a murderer to pursue and overtake his victim, and from which the fatal shots were fired.

In *Blood,* page 817, the court said:

"The foregoing distinction was clarified by language in *Harris v. United States* [1947], 331 U. S. 145, 91 L. Ed. 1399, 67 S. Ct. 1098, as follows:

" '. . . This Court has frequently recognized the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime. . . .' (p. 154.)"

In *State v. Hunt,* 198 Kan. 222, 424 P. 2d 571, this court spoke of the right to seize the fruits of crime when incident to a lawful arrest

and what was there said likewise applies to seizure of the instruments of a crime. Syllabus 1 reads:

"The fruits of crime when in open view of an officer lawfully on the premises or in a public street may furnish probable cause to make an arrest under all the surrounding circumstances, and when a lawful arrest is made of the person having possession of the same the officer may properly seize the property and make an additional search if incidental to the lawful arrest."

Under the evidence in the record the automobile was an instrument used to commit the crime. Arrest of the defendant was made prior to seizure and upon probable cause. Seizure of the car and the evidence therein was proper under the circumstances. Such evidence was properly admitted in evidence in the case.

We have carefully examined the voluminous record in this case and find the verdict of guilty supported by sufficient substantial evidence to justify the trial court's order approving the same and the judgment is affirmed.